**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2732
_____

CHARLES CLARK, III; SOLID ROCK BAPTIST
CHURCH, New Jersey not-for-profit corporation; BIBLE
BAPTIST CHURCH OF CLEMENTON, New Jersey not-for-
profit corporation; CHARLES CLARK, JR.;
PASTOR ANDREW REESE,
                              Appellants

v.

GOVERNOR OF THE STATE OF NEW JERSEY;
ATTORNEY GENERAL OF THE STATE OF NEW
JERSEY; PATRICK J. CALLAHAN, Superintendent of State
Police and State Director of Emergency Management in his
official capacities; JILL S. MAYER; THOMAS J. WEAVER;
CHIEF CHARLES GROVER; RICK MILLER; MILLARD
WILKINSON; RICHARD A. DE MICHELE; CHERYL R.
HENDLER COHEN
_____

On Appeal from the United States District Court
for the District of New Jersey
(District Court No. 1:20-cv-06805)
District Judge: Honorable Renee M. Bumb
_____

Argued August 23, 2022

(Filed:  November 28, 2022)

Before: Greenaway, Jr., Matey, and Rendell, *Circuit Judges*.

David C. Gibbs, Jr.
Jonathan D. Gibbs
Seth J. Kraus
GIBBS & ASSOCIATES
6398 Thornberry Court
Mason, OH 45040

Brian D. Tome                [Argued]
REILLY MCDEVITT & HENRICH
3 Executive Campus
Suite 310
Cherry Hill, NJ 08002

Walter S. Zimolong, III
ZIMOLONG LLC
P.O. Box 552
Villanova, PA 19085

    *Counsel for Appellants*

Matthew J. Berns[*]          [Argued]
Jeremy Feigenbaum
Robert J. McGuire
Daniel M. Vannella

---

[*] Matthew J. Berns withdrew his appearance on October 31, 2022 after oral argument.

OFFICE OF ATTORNEY GENERAL OF NEW JERSEY
DIVISION OF LAW
25 Market Street
Hughes Justice Complex
Trenton, NJ 08625

> *Counsel for Appellees Governor of New Jersey, Attorney General of New Jersey, Patrick J. Callahan*

George J. Botcheos
1202 Laurel Oak Road
Suite 208
Voorhees, NJ 08043

> *Counsel for Appellee Thomas J. Weaver, Charles Grover, Cheryl R. Hendler-Cohen*

_____

OPINION OF THE COURT
_____

**RENDELL**, *Circuit Judge*.

Once again, we have been asked to decide whether a challenge to long defunct COVID-19 pandemic restrictions presents a justiciable controversy.[1]  Because the in-person gathering limits complained of here were rescinded over two

---

[1] *See Cnty. of Butler v. Governor of Pennsylvania*, 8 F.4th 226 (3d Cir. 2021).

years ago and it is absolutely clear their return could not reasonably be expected to recur, we hold that the case is moot.

## I. BACKGROUND

### A.

In March 2020, New Jersey Governor Philip Murphy took a series of measures to respond to the spread of COVID-19.[2] In Executive Order ("EO") 103, he declared a state of emergency pursuant to the Civilian Defense and Disaster Control Act, N.J. Stat. Ann. § A:9-33, et seq., as well as a public health emergency pursuant to the Emergency Health Powers Act, N.J. Stat. Ann. § 26:13, N.J. Stat. Ann. These declarations empowered the Governor to issue follow-up orders addressing the pandemic, an authority he went on to use.

On March 21, Governor Murphy issued EO 107, which, *inter alia*, prohibited in-person gatherings and ordered New Jersey residents to "remain home or at their place of residence," except for certain approved purposes, such as an "educational, political, or religious reason." *See Solid Rock Baptist Church v. Murphy*, 480 F. Supp. 3d 585, 589 (D.N.J. Aug. 20, 2020) (citing N.J. Exec. Order 107 ¶ 2 (Mar. 21,

---

[2] Governor Murphy is the lead Defendant-Appellee named in this appeal, as he promulgated the relevant executive orders. Eight other state and local officials responsible for interpreting and enforcing the Governor's orders are also named. In this opinion, we refer to these individuals and the Governor collectively as "Appellees" or "the State."

2020)) ("*Solid Rock I*"). EO 107 excepted certain categories of businesses deemed "essential," including grocery and liquor stores, which could continue to welcome any number of persons (consistent with social distancing guidelines). *Id*. at 588–89. Violations of EO 107's proscriptions were enforceable by criminal prosecution for "disorderly conduct," N.J. Stat. Ann. § App. A:9-49. Further, the order granted Defendant-Appellee Colonel Patrick Callahan, Superintendent of the State Police, "discretion to make clarifications and issue [related] orders[.]" N.J. Exec. Order 107 ¶ 6 (Mar. 21, 2020). He exercised that power the same day EO 107 was signed, declaring in Administrative Order No. 2020-4 that gatherings of ten or fewer persons were presumptively permitted.[3] Neither EO 107 nor AO 2020-4 contained an exception for religious worship gatherings or other First Amendment-protected activity.

B.

Plaintiff-Appellants are two New Jersey-based, Christian congregations, Solid Rock Baptist Church and Bible Baptist Church of Clementon, and their respective pastors, Andrew Reese and (as co-pastors) Charles Clark III and Charles Clark, Jr. Appellants believe that the Holy Bible requires them to gather for in-person worship services. Although both congregations switched to online services in the wake of the Governor's gathering restrictions, by late May

---

[3] Colonel Callahan's clarifying order would, itself, be adopted in Governor Murphy's Executive Order 142, on May 13, 2020.

5

2020 they had resolved to defy those rules and return to in-person worship. After informing state authorities of their intention to do so, the two churches held services with more than ten persons in attendance. Local police, executive officials, and prosecutors—several of whom are named Defendant-Appellees[4]—then participated in issuing and pursuing criminal complaints against the Pastors for their violations of EO 107 and AO 2020-4.

Aggrieved by these actions, Appellants filed a complaint in the United States District Court for the District of New Jersey on June 3, 2020, naming Governor Murphy, New Jersey Attorney General Gurbir Grewal, Superintendent Callahan, and a slew of local officials as defendants. In the complaint, Appellants "challenge[d] Executive Order No. 107 . . . as further clarified by Administrative Order No. 2020-4," App. 36, asserting that the orders discriminated against religion by effectively closing churches while permitting secular activities deemed "essential" to operate unimpeded, App. 37. Appellants sought relief in the form of "a preliminary and permanent injunction enjoining Defendants or their designees or agents from enforcing the challenged Orders under any 'social distancing' requirements different from those

_____

[4] These include: Jill S. Mayer, Camden County Prosecutor for Clementon Borough; Thomas J. Weaver, Mayor of Clementon Borough; Charles Grover, Chief of Clementon Borough Police Department; Rick Miller, Mayor of Berlin Borough; Millard Wilkinson, Chief of Berlin Borough Police Department; Richard A. De Michele, Prosecutor for Berlin Borough; Cheryl R. Hendler Cohen, Prosecutor for Clementon Borough.

6

governing 'essential' businesses or services," "a declaratory judgment and preliminary and permanent injunction that the challenged Orders are unconstitutional, on their face and as applied," and an award of costs, including attorneys' fees. App. 54. They did not seek damages.

## C.

Less than a week after the complaint was filed, on June 9, 2020, Governor Murphy rescinded EO 107 in relevant part. In EO 152, the Governor raised indoor gathering limits to fifty persons or twenty-five percent room capacity (whichever was less); the order also permitted outdoor religious gatherings *without any gathering limits*, in recognition of the "particular[] importan[ce]" of "religious services" to the functioning of society. *See* N.J. Exec. Order 152 at 4, ¶ 2(f) (June 9, 2020) (further excepting outdoor political gatherings, such as "protests"). The same day, EO 153 rescinded EO 107's general stay-at-home requirement. N.J. Exec. Order 153 ¶ 11 (June 9, 2020).

EOs 152 and 153 presaged a trend; in the months that followed, Governor Murphy progressively relaxed the restrictions applicable to religious worship services. On June 22, 2020, EO 156 further loosened the restrictions applicable to Appellants, raising the maximum number of persons allowed at an indoor gathering to 100. N.J. Exec. Order 156 ¶

7

1 (June 22, 2020).[5] On September 1, EO 183 permitted religious gatherings of up to 150 persons. N.J. Exec. Order 183 ¶ 4 (Sept. 1, 2020) (retaining a twenty-five-person limit for generic secular gatherings). When COVID-19 case rates trended sharply upward in November, gathering limits were tightened for many contexts, but worship services were excepted and retained the limits set forth in EO 183. *See* N.J. Exec. Order 196 at 3, ¶ 1 (stating that "religious services" are "constitutionally protected").

On February 3, 2021, EO 219 increased the general gathering limit to 150 persons or thirty-five percent capacity and, on February 22, EO 225 set a new gathering limit for indoor religious services of fifty percent room capacity, *with no numerical limit*. *See* N.J. Exec. Order 219 ¶ 3 (Feb. 3, 2021); N.J. Exec. Order 225 at 3–4, ¶ 1 (Feb. 22, 2021) ("[A]t certain times, restrictions on [religious worship] gatherings should be less aggressive than restrictions on other gatherings[.]"); *see also* N.J. Exec. Order 230 at 5 (Mar. 11, 2021) ("[R]estrictions on [religious worship] gatherings should be less aggressive than restrictions on other gatherings[.]").

Ultimately, on May 12, 2021, Governor Murphy issued EO 239, which eliminated the remaining fifty percent capacity gathering restriction applicable to religious worship. *See* N.J.

---

[5] Although not every executive order discussed herein was entered into the record below, we may take judicial notice of their content. *See, e.g.*, *Union Cnty. Jail Inmates v. Di Buono*, 713 F.2d 984, 988 n.4 (3d Cir. 1983) (taking judicial notice of state executive orders).

Exec. Order 239 ¶ 6 (May 12, 2021) (conditioning worship service attendance on the need for social distancing only). In EO 239, the Governor explained that this policy adjustment was driven by, among other things: (1) the "critical knowledge" that had been gained regarding COVID mitigation strategies; (2) "expanded access to testing, personal protective equipment, and other materials"; (3) reduced infection and hospitalization rates; and (4) the substantial progress in vaccination rollout. *See id*. at 4. On May 24, 2021, EO 242 lifted all remaining numerical gathering limits for non-religious contexts and rescinded the general social distancing guideline for religious services. N.J. Exec. Order 242 ¶¶ 4–6 (May 24, 2021). On June 4, 2021, EO 244 ended the public health emergency in the state. N.J. Exec. Order 244 ¶ 1 (June 4, 2021).

## D.

Governor Murphy's gradual loosening of restrictions impacted Appellants' parallel action in the District Court. On August 8, 2020, the District Court denied Appellants' motion for a preliminary injunction—which had demanded permission to worship in groups larger than ten persons—holding that the very relief requested had been, "in effect, granted through the enactment of Executive Order 156 [permitting 100 persons or twenty-five percent capacity at all indoor gatherings]." *Solid Rock I*, 480 F. Supp. 3d at 588. The District Court reasoned that EO 156 thus mooted the claim for relief and denied without prejudice the remaining claims, which are not relevant to this appeal. *Id*. at 601.

One month later, Appellants filed an amended complaint. *Solid Rock II*, 555 F. Supp. 3d at 57. Again, they presented a narrow claim "challeng[ing] Executive Order ("EO") No. 107" as "further clarified by Administrative Order ("AO") No. 2020-4." *Id*. at 56. The amended complaint focused exclusively on the ten-person gathering limit created by those Orders and demanded that said "challenged Orders" be declared unconstitutional. *Id*. at 61. On August 16, 2021, the District Court dismissed the amended complaint, holding that Appellants' claims were all moot. *Id*. at 62. The District Court observed that "the contested EO 107 was rescinded by several of Governor Murphy's additional orders" and there had been no limit on outdoor worship services since June 9, 2020; thus, "there can be no dispute that the alleged unlawful conduct—EO 107—has been terminated by Defendants." *Id*. at 61. Nor did the District Court find it sufficiently plausible that such restrictions might return: "Plaintiffs present no evidence to suggest that the State will again enact measures restricting religious worship but worry about the possibility of the State's future response." *Id*. (citing *Cnty. of Butler v. Governor of Pennsylvania*, 8 F.4th 226, 233 (3d Cir. 2021) (Jordan, J., concurring)).[6] Finally, the District Court held that, insofar as Appellants' claims invited the District Court to interfere in the ongoing prosecution of the Pastors, it would

---

[6] The District Court also reasoned that intervening Supreme Court precedent, *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) and *Tandon v. Newsom*, 141 S. Ct. 1294 (2021), ensured that the State would not repeat the alleged harms. We discuss the relevance of those cases in detail below.

10

abstain under the doctrine of *Younger v. Harris*, 401 U.S. 37 (1971). *Solid Rock II*, 555 F. Supp. 3d at 57.

Appellants timely appealed.

E.

The COVID-19 pandemic and the State's response thereto have continued to evolve since this appeal was filed. On December 15, 2021, the criminal cases against the Appellant Pastors were voluntarily dismissed.[7] Over the fall and winter of 2021–22, the Delta and Omicron variants led to a spike in the reported cases of COVID, prompting Governor Murphy to declare a new public health emergency in EO 280, issued on January 11, 2022. N.J. Exec. Order 280 at 8 (Jan. 11, 2022). Although more COVID orders followed in the subsequent months, Governor Murphy refrained from reimposing any gathering restrictions. On March 4, he lifted the public health emergency once again in EO 292. N.J. Exec. Order 292 ¶ 1 (Mar. 4, 2022). When case reports trended

---

[7] As explained above, the prosecutions of the Pastors were initiated in May 2020. At Oral Argument, the Panel was informed that, for some uncertain period between initiation and dismissal, the prosecutions were stayed at the request of the parties. The record in the District Court reveals that the action against Pastor Reese had been stayed by August 2020, at which time a request to stay the parallel prosecution of the Clarks was pending in state court. ECF Dkt. 20-cv-6805, Doc. No. 30. Both matters had been stayed by April 2021, "in anticipation of [the District Court's ruling]." Doc. No. 74.

11

upward in May, no health emergency was declared, nor were any gathering restrictions implemented.[8]

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291, regardless of whether the case is moot. *See Hartnett v. Pennsylvania State Educ. Ass'n*, 963 F.3d 301, 305 (3d Cir. 2020). We review the District Court's legal conclusions de novo and its factual findings for clear error. *Id.*

## III. THE DISTRICT COURT CORRECTLY HELD THIS CASE IS MOOT

Before us, Appellants contend that this case is not moot. We disagree. The District Court correctly found that the Governor's partial rescission of the orders challenged in the amended complaint ended any live controversy. Insofar as the prosecutions animated a continuing dispute, their voluntary dismissal leaves no escape from mootness. Moreover, it is absolutely clear there is not a reasonable likelihood that the

---

[8] *See New Jersey COVID-19 Dashboard*, NEW JERSEY DEPARTMENT OF HEALTH, https://www.nj.gov/health/cd/topics/covid2019_dashboard.sht ml (last visited September 6, 2022); *Valentine v. Collier*, 960 F.3d 707, 708 (5th Cir. 2020) (taking judicial notice of state COVID statistics).

12

restriction orders will be reimposed, so the voluntary cessation doctrine does not save this case.

## A.

The jurisdiction of the federal courts is limited to "Cases" and "Controversies". U.S. Const. art. III, § 2, cl. 1. "Thus, [we] can entertain actions only if they present live disputes, ones in which both sides have a personal stake." *Hartnett v. Pennsylvania State Educ. Ass'n*, 963 F.3d 301, 305 (3d Cir. 2020) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 492–93 (2009)). The doctrine of mootness ensures that this condition remains "throughout the life of the lawsuit." *See Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 476 (3d Cir. 2016) (quoting *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993)); *see also Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.'" (quoting *Alvarez v. Smith*, 558 U.S. 87, 93 (2009))).

If it is impossible for us to grant "any effectual relief whatever to the prevailing party," then the case is moot. *See, e.g.*, *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016) (quoting *Knox v. Serv. Emps.*, 132 S. Ct. 2277, 2287 (2012)); *see also N.Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1526 (2020) (holding that case became moot when statutory amendments provided the relief sought); *Trump v. Hawaii*, 138 S. Ct. 377 (2017) (Mem.) (holding that

13

challenge to expired provision of an executive order was moot). Yet, one "recurring situation" in which we are reluctant to dismiss a case as nonjusticiable—despite the absence of ongoing conduct to enjoin—occurs where the defendant claims the matter has become moot owing to his voluntary cessation of the challenged action. *Hartnett*, 963 F.3d at 306–07; *see City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power."). In such cases, the defendant asserting mootness bears a particularly "heavy burden": it must be "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *See, e.g.*, *Fields v. Speaker of the Pa. House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019) (quoting *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007)).[9]

Here, Appellees contend that Governor Murphy's rescission of the relevant portions of EO 107 (which AO 2020-4 purported to apply) has rendered this case moot. Indeed, Appellees point out, indoor religious worship services in New Jersey have not been subject to *any* capacity restrictions for

---

[9] Further, "[w]hen a plaintiff seeks declaratory relief, a defendant arguing mootness must show that there is no reasonable likelihood that a declaratory judgment would affect the parties' future conduct." *Hartnett*, 963 F.3d at 306 (citations omitted).

well over a year; so, "[t]here is simply no prospective relief left for this Court to grant." Appellees' Br. at 13. Appellants reply that the case appears moot only because of the Governor's unilateral rescission of his COVID orders, meaning that the voluntary cessation doctrine imposes its "heavy burden" on any claim of mootness. In turn, Appellees seek to meet that burden by pointing to several factors, including the radically changed public health situation and the lack of renewed gathering restrictions during the Delta and Omicron waves.

Appellants also contend that the District Court incorrectly saddled them with the burden of showing a likelihood of recurrence. *See Solid Rock II*, 555 F. Supp. 3d at 61 ("Plaintiffs present no evidence to suggest that the State will again enact measures restricting religious worship but worry about the possibility of the State's future response."). We agree the District Court should have been clearer that the State, as "the party claiming mootness," bore the burden of demonstrating that it was absolutely clear there was no reasonable likelihood of recurrence. *See Hartnett*, 963 F.3d at 307 (citation omitted). As noted above, that burden is especially heavy where the claim of mootness is based on voluntary cessation of the challenged conduct. *Id.* at 307 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). However, this error does not impact our analysis as we review whether this case is moot de novo. *See Hamilton v. Bromley*, 862 F.3d 329, 333 (3d Cir. 2017).

For the reasons discussed below, we conclude that the controversy over Governor Murphy's orders ended with their

15

rescission and Appellees have carried their burden of showing that it is absolutely clear that recurrence is not reasonably likely.

1.

This case is facially moot. The relevant portions of EO 107 and AO 2020-4 were rescinded by Governor Murphy over two years ago; thus, there is no "effectual relief whatsoever" that this Court may grant in relation to those orders. *See Campbell-Ewald Co*, 577 U.S. at 161. In the amended complaint, Appellants chose to put their challenge narrowly and identify those orders alone as the objects of their ire— despite knowing that New Jersey's COVID regime had already begun to relax. The choice to confine the scope of litigation meant the Governor's first steps towards reopening rendered Appellants' amended complaint moot-on-arrival.

More broadly, the Governor's orders ceased to disfavor religion (even in relation to so-called "essential" businesses) no later than February 22, 2021, when EO 225 ended that suspect imbalance. *Compare* N.J. Exec. Order 225 ¶ 1 (Feb. 22, 2021) (raising indoor religious worship capacity limit to fifty percent) *with* N.J. Exec. Order 122 ¶1(a) (Apr. 8, 2020) (setting maximum "essential retail business" occupancy at fifty percent). Even if we were to be charitable and read the amended complaint as raising a challenge to *any* COVID-based gathering restriction on religious worship, then Appellants *still* received the very relief sought in May 2021, when the last gathering restrictions ended. *See* N.J. Exec. Order 239 ¶ 6 (May 12, 2021) (limiting religious service

attendance based only on the need for social distancing); N.J. Exec. Order 242 ¶ 10 (May 24, 2021) (rescinding EO 239's social distancing condition); *Brach v. Newsom*, 38 F.4th 6, 11 (9th Cir. 2022) (challenge to executive COVID orders was moot after rescission of all such orders, where action had sought injunctive and declaratory relief); *Eden, LLC v. Justice*, 36 F.4th 166, 169 (4th Cir. 2022) (same). It thus appears that this Court cannot grant any effectual relief to Appellants, so their claims are no longer justiciable.[10]

2.

Nonetheless, Appellants insist the case remains justiciable under the voluntary cessation doctrine, correctly observing that "even if the government withdraws or modifies a COVID restriction in the course of litigation, that does not *necessarily* moot the case." *Tandon*, 141 S. Ct. at 1297 (emphasis added). They argue that the State has failed to meet its burden of showing that it is absolutely clear a return to

---

[10] Appellants argue that their claim for attorneys' fees has not been vindicated, thus keeping the case alive. Not so. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("An 'interest in attorney's fees is . . . insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim.'" (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990))); *Ivy Club v. Edwards*, 943 F.2d 270, 276 (3d Cir. 1991) ("[A]n interest in attorneys' fees does not save a matter from mootness.").

restrictions on religious worship is not reasonably likely, so we ought to opine on the legality of the defunct orders.

Before facing that proposition head-on, we pause to clarify the scope of our inquiry. For Appellants to prevail, we need not conclude it is likely that the *exact same* restrictions contained in EO 107 (and AO 20202-4) will return. At the same time, it is not as though the chance of *any* future COVID-related restrictions on Appellants' religious exercise will do. Rather, the hypothesized restriction must be "'similar' enough to the [original restriction] to present substantially the same legal controversy as the one presented" here. *See, e.g.*, *Resurrection Sch. v. Hertel*, 35 F.4th 524, 528 (6th Cir. 2022) (citing *Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 662 n.3 (1993)).

Appellants' amended complaint attacked an indoor gathering limit of ten persons and observed that certain secular activities were subject to more generous rules. Logically, then, a reasonable likelihood that Governor Murphy will, say, impose a *ninety percent* capacity limit on all indoor gatherings, or create a restriction that treats churches *more* favorably than grocery stores, would not suffice. We would not be contemplating the resurrection of the current controversy, but the creation of a new one, even if some legal issues recurred. Thus, Appellees' burden amounts to convincing us that it is absolutely clear that it is not reasonably likely they will re-impose severe in-person gathering restrictions applicable to religious worship services, nor differential burdens favoring

18

secular over religious gatherings. Several considerations persuade us this burden is met.[11]

First, as we have noted, mootness concerns itself with whether the same legal controversy will recur. The controversy here has two aspects to it: (1) whether the same precise situation—the pandemic such as it presented itself in 2020 and 2021—will occur again; and (2) whether the Governor will respond to that situation by imposing restrictions similar enough to those he imposed in 2020 and 2021, such that it presents "substantially the same legal controversy as the one presented" here. *Resurrection Sch.*, 35 F.4th at 528. It is absolutely clear that neither of those aspects are reasonably likely to recur. Regarding the likelihood that the same pandemic conditions we faced in 2020-21 will repeat themselves, it is hard to imagine that we could once again face

---

[11] The dissent appears to require some definitive statement or assurance from the Governor that, even if the same pandemic conditions reoccurred, he would not impose restrictions on religious gatherings. First, why would we require a government official to engage in that kind of speculation based on hypothetical facts? The dissent does not say. Second, and more importantly, Appellees' task is not to offer us *absolute certainty* that the restrictions will not happen again; instead, they must show it is "absolutely clear that the allegedly wrongful behavior *could not reasonably be expected to recur*." *Fields*, 936 F.3d at 161 (quoting *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007)) (emphasis added). Appellees have done precisely that.

anything quite like what confronted us then. Moreover, the public health outlook has changed dramatically since the dark days of March 2020, when the ten-person gathering limit was implemented. Our knowledge of the virus and its vectors of transmission, the rollout of vaccines, and the availability of therapeutic responses to infection have totally changed the nature of the disease itself, our understanding of it, and our response to it. The accumulation of those changed circumstances thus make the return of the same pandemic and the same restrictions unlikely. *See, e.g.*, *Cnty. of Butler*, 8 F.4th at 230[12]; *id*. at 233 (Jordan, J., concurring); *Lighthouse*

---

[12] In *County of Butler v. Governor of Pennsylvania*, 8 F.4th at 226, we held that a challenge to various Pennsylvania COVID restriction orders was moot, *id*. at 232. That conclusion was based on changed circumstances (1) on "the health front" and (2) "on the legal front." *Id*. at 230. Regarding the latter, we explained that "[a]n amendment to the Pennsylvania Constitution and a concurrent resolution of the Commonwealth's General Assembly now restricts the Governor's authority to enter the" sort of orders challenged in the case. *Id*. Here, Appellants and the dissent contend vigorously that *Butler* can be distinguished from the present action, as New Jersey's Governor still has the legal authority to issue COVID restrictions. We disagree. Although the change in the law was a factor in *Butler*, because we noted that the Pennsylvania Health Secretary *retained* the authority to issue comparable COVID orders and yet still held the case was moot, the change was undoubtedly not a *necessary* condition for our holding. *Id*. at 231 ("Plaintiffs have not carried [their] burden [under the capable-of-repetition doctrine]. Plaintiffs

20

*Fellowship Church v. Northam*, 20 F.4th 157, 164 (4th Cir. 2021); *see also Brach*, 38 F.4th at 15 (same medical factors suggest that school closures will not return). Governor Murphy relied on these facts when he eliminated the remaining gathering restrictions in May 2021. *See, e.g.*, N.J. Exec. Order 239 at 1–7. As we have no reason to doubt the sincerity of that justification, *see Cnty. of Butler*, 8 F.4th at 230–31 (describing the presumption of good faith accorded government officials), the Governor's motivation further supports mootness: we are generally less skeptical of voluntary cessation claims where the change in behavior was unrelated to the relevant litigation, *see id*. (holding voluntary cessation burden did not save the case because the challenged orders were not terminated "as a response to the litigation"); *Hartnett*, 963 F.3d at 306–07 ("[T]he defendant's reason for changing its behavior is often probative of whether it is likely to change its behavior again. . . . [I]f the defendant ceases because of a new statute or a ruling in a completely different case, its argument for mootness is much stronger.") (citations omitted). Thus, New Jersey's acknowledged medical progress militates against a reasonable

---

have pointed only to the fact that the Secretary of Health still claims the power to issue orders of the sort before us now."). Our decision in *Butler* thus provides strong precedential support for mootness here. True, as the dissent notes, we were proceeding under the capable-of-repetition doctrine of mootness, but the health factors we identified as supporting mootness in *Butler* are still present here and point in the same direction, yet the dissent offers no reason why the voluntary cessation doctrine requires us to disregard those same health factors when evaluating mootness in this case.

likelihood of a recurrence of the same pandemic and similar future gathering restrictions.[13]

Second, Appellees can point to a track record since May 2021 of declining to reimpose gathering restrictions, even during periods when COVID case rates increased precipitously. The fact that such restrictions did not return during the Delta and Omicron waves—nor during the less extreme increase of May 2022—indicates that gathering restrictions are reasonably unlikely to return as a COVID mitigation measure. *See, e.g.*, *Eden, LLC*, 36 F.4th at 171 ("If there were any reasonable chance that the [West Virginia] Governor might reimpose the safety measures at issue . . . then those waves of increased infection should have been the occasion for doing so. But they were not, and like other courts, we see that as a powerful signal that whatever course the COVID-19 pandemic takes, a return to restrictions like those challenged here is highly unlikely.") (citation and quotation marks omitted); *see also Brach*, 38 F.4th at 14 (state's

---

[13] The dissent urges that this case should be controlled by *West Virginia v. EPA*, 142 S. Ct. 2587 (2022). But that case is easily distinguishable. There, the event that would trigger recurrence of the challenged policy—i.e., the resolution of the litigation in the government's favor—could very easily happen, and the government was unwilling to say it would not impose the policy again if it did. *See* 142 S. Ct. at 2607. Here, the triggering event of a similar pandemic is not likely to recur. And to be clear, the discussion of mootness in *West Virginia* consists of two paragraphs—another reason why the discussion there cannot bear the weight the dissent places on it.

continuation of in-person school instruction during variant wave supported mootness); *Hertel*, 35 F.4th at 530–31 (Moore, J., concurring) (state's decision to forgo school mask mandate during variant waves supported mootness). Appellants have even demonstrated a unique reluctance to tighten restrictions on *religious* exercise. During the winter of 2020–21, when most gathering contexts were subjected to decreased occupancy limits, religious worship was excepted. *See* N.J. Exec. Order 196 ¶ 1. This made sense given the Governor's expressed respect for religious freedom in his executive orders, starting with EO 152 in early June 2020.[14] [15]

---

[14] Granted, the early executive orders did burden religious worship gatherings, a fact we address further below. But the point remains: if New Jersey officials were remotely likely to reimpose some form of gathering restriction, then they would have done so when case rates exploded because of the more transmissible Delta and Omicron variants, but they did not.

[15] Appellants point out that Governor Murphy has continued to extend the state of emergency pursuant to the Disaster Control Act, despite ending the public health emergency declared under the Emergency Health Powers Act. *See* N.J. Exec. Order 292 at ¶ 1–2. The continuation of the emergency state means, in turn, that Governor Murphy still has the authority to issue COVID restrictions—a condition Appellants and the dissent tell us defeats the State's ability to meet its voluntary cessation burden. But the mere fact that Governor Murphy retains the power to reinstate the restrictions complained of does not mean we have a live controversy. *See, e.g.*, *Rendell v. Rumsfeld*, 484 F.3d 236, 242 (3d Cir. 2007) ("[S]tatutory changes that

23

Third, in the years since EO 107 was promulgated, there has been significant, intervening Supreme Court precedent. In *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. at 63, and *Tandon v. Newsom*, 141 S. Ct. at 1294, the Court emphasized that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise," *Tandon*, 141 S. Ct. at 1296. This rule provided state officials with crucial guidance in shaping any future COVID restrictions, instructing them that such regulations must be neutral and generally applicable in all but the narrowest of circumstances. We believe there is no reasonable likelihood that the State will tempt fate by reimposing restrictions disfavoring religion in the teeth of this caselaw. *See, e.g.*, *Hawse v. Page*, 7 F.4th 685, 693 (8th Cir. 2021) ("Even in the hypothetical event that the County were to reinstate gathering limits of fewer than ten persons, there is no reasonable expectation that the County would flout the Supreme Court's

discontinue a challenged practice are usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the law suit is dismissed.") (internal citations and quotation marks omitted); *Bos. Bit Labs, Inc. v. Baker*, 11 F.4th 3, 10 (1st Cir. 2021) ("That the Governor has the power to issue executive orders cannot itself be enough to skirt mootness, because then no suit against the government would ever be moot. And we know some are.") (citations omitted). Nor does the existence of a state of emergency show that a return to gathering restrictions is reasonably likely. *See, e.g.*, *Eden, LLC*, 36 F.4th at 172 n.5.

24

intervening pronouncements on equal treatment between religious exercise and comparable secular activity."); *Hertel*, 35 F.4th at 529.[16]

Appellants argue that Governor Murphy has shown a lack of respect for these precedents by failing to issue relaxed COVID guidance fast enough after they were announced.

_____

[16] Appellants direct us to the Supreme Court's holding in *Diocese of Brooklyn* that rescission of COVID restrictions might not moot a case where the defendant "regularly changes" the regime applicable to the plaintiffs. 141 S. Ct. at 68. There, New York had implemented a geographic risk classification system that resulted in rapid changes—sometimes several in a single week—to the capacity caps applicable to houses of worship. *Id*. at 69 n.3. That situation kept the case alive because petitioners lived under "a constant threat" that they would again be subjected to a harsher classification. *Id*. at 67–68. The instant case is plainly distinguishable. As detailed above, Governor Murphy progressively loosened restrictions on religious worship services starting in June 2020. The regulations applicable to religious exercise have moved in only one direction in New Jersey: towards increased freedom. Appellants have not been subject to any numerical or capacity limits on their worship gatherings since May 2021, well over a year ago. There is thus no comparison to be made with the New York system of sudden, inconsistent, and ongoing changes that gave the *Diocese of Brooklyn* Court pause. *See Brach*, 38 F.4th at 14–15. For the same reasons, we do not believe that Appellees have the "track record of 'moving the goalposts'" that concerned the Court in *Tandon*. *See* 141 S. Ct. at 1297.

When pressed at oral argument, however, Appellants' counsel conceded that the State's regime already avoided strict scrutiny under the rule of these cases by the time they had both been decided. When *Tandon* came down in April 2021, religious worship gatherings were subject to the same fifty percent capacity limit applicable to essential businesses, and they had been since February 2021.

Further, although the prosecution of the Pastors continued for months after the Supreme Court had implicitly cast doubt on the validity of EO 107's proscriptions, we do not take this as persuasive evidence that the Governor and other high state officials are dismissive of precedent. As explained above, it appears the prosecutions had been stayed when *Diocese of Brooklyn* and *Tandon* were decided, and they would remain so for some time after. It is thus not as though the State was actively pressing for convictions in the face of ominous caselaw. And we are hesitant to read the actions of municipal prosecutors as reflecting directly on the views and intentions of New Jersey's highest officials.[17] Although the Attorney General does exercise ultimate supervisory authority over local prosecutors (subject to the Governor's oversight), there is no unified chain-of-command, and he is not responsible for their

---

[17] Several local officials are named Appellees, but the scenario that Appellants fear is not that these individuals will sua sponte reinstitute the prosecutions. Rather, at this stage of the litigation, all mootness analysis centers on the Governor, asking if *state-wide restrictions* will return via executive orders. Local officials would presumably have no role in that critical decision.

day-to-day functioning. *See Yurick v. State*, 184 N.J. 70, 79 (2005) (citations omitted). The delay in dismissing the prosecutions thus reflects on the Governor and his cabinet only indirectly.

Finally, even assuming a reasonable likelihood of *some* COVID-based gathering restriction returning, it is implausible that a challenge to that restriction would constitute the *same legal controversy* as the one before us now. Given *Diocese of Brooklyn* and *Tandon*, the State is now on notice that religious exercise cannot be disfavored relative to comparable secular activity, even if the latter is deemed an "essential service" during emergency conditions. *See Hertel*, 35 F.4th at 529 ("The Supreme Court and other courts have since blocked any number of [COVID orders], thereby providing concrete examples of mandates and restrictions that violate the Free Exercise Clause."). We have no reason to doubt the sincerity of the State's assurance that it will adhere to these precedents in the future. *See Cnty. of Butler*, 8 F.4th at 230–31 (citation omitted). Consequently, any future restriction on religious worship would likely omit the key legal issue raised in Appellants' amended complaint: that "[Appellees'] Orders are not neutral laws of general applicability because they target constitutionally protected activity . . . all the while providing broad exemptions for many secular activities[.]" Amend. Compl. ¶ 4.

In any event, we need not hypothesize further about what a renewed COVID restriction regime in New Jersey might look like. The point is that the very possibility of such

27

renewed restrictions is itself speculative, and an analysis of the legal status of such hypothesized rules doubly-so.

\* \* \* \* \*

In sum, we are persuaded that this case is moot, as the District Court correctly found. Appellants offer nothing more than speculation to suggest that we have a live controversy here. They invite us to hypothesize about future scenarios in which (a) not only does the COVID-19 pandemic reach crisis levels comparable to early-2020, but (b) New Jersey's executive officials will choose to ignore everything—both legal and factual—we have learned since those early months and bluntly reintroduce legally-suspect gathering restrictions on religious worship. This will not do, and we will therefore affirm.[18] [19]

---

[18] Because the prosecutions of the Pastors were voluntarily dismissed, we have no occasion to discuss *Younger* abstention. The dismissed prosecutions do not serve as the sort of "continuing injury" that might defeat mootness. *See Hartnett*, 963 F.3d at 308.

[19] This conclusion addresses Appellants' request for injunctive relief as well their request for a declaratory judgment. As it is absolutely clear there is no reasonable likelihood that EO 107 will be reinstated, there is likewise no reason to think the declaratory judgment requested would affect the parties' conduct. *See Hartnett*, 963 F.3d at 306.

MATEY, *Circuit Judge*, dissenting.

From the outbreaks of Athens, Byzantium, and London, to the ravages of smallpox, SARS, and "Swine Flu," plagues punctuate the pages of history. When such a potent enemy appears, it is natural to reach for every weapon, every tool, anything that might turn the tide. Anything that ends the emergency. But emergencies have long been "the pretext on which the safeguards of individual liberty have been eroded— and once they are suspended it is not difficult for anyone who has assumed such emergency powers to see to it that the emergency will persist." 3 F.A. Hayek, Law, Legislation and Liberty 124 (1979). Guarding against that threat is one reason the permanent guarantees of our natural rights were recognized in the Constitution. And examining whether those guarantees have been honored or breached is part of the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

The majority concludes that Governor Murphy's choice to place significant limitations on religious gatherings is no longer a live controversy because those restrictions were relaxed and eventually withdrawn. But the Governor changed course unilaterally, not as the result of any legal force. Neither Governor Murphy nor New Jersey's Attorney General has ever hinted, let alone assured, that the Governor will not reimpose those same limits down the long COVID-19 road. And neither acknowledge any boundaries on the Governor's emergency powers in the decisions of the Supreme Court, or even in the Constitution. Caveats all insufficient to carry the "heavy" burden, *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022), to sidestep judicial review of these restrictions on religion. As the longstanding limits on mootness do not relax for COVID-19

controversies, I would remand the matter to the District Court and so respectfully dissent.

**I.**

Mootness means a once live dispute "is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Alvarez v. Smith*, 558 U.S. 87, 93 (2009). But how a suit became moot matters. If a savvy defendant could simply say, "never mind," and stop the offending conduct long enough to win dismissal, the federal courts would have little work to do. As a result, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). Instead, we ask whether the "allegedly wrongful behavior" has ended, or merely paused. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007). Understandably, any answer is no more than a prediction. So we look at the circumstances to see if the defendant "could reasonably be expected to engage in the challenged behavior again." *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 306 (3d Cir. 2020). Naturally, "the defendant's reason for changing its behavior is often probative." *Id.* Did the defendant merely "yield[] in the face of a court order" while still maintaining "that its conduct was lawful all along"? *Id.* Or did the defendant stand down "because of a new statute or a ruling in a completely different case"? *Id.* at 307. Either way, it must be "absolutely clear" that the same acts could not "reasonably be expected to recur." *West Virginia v. EPA*, 142 S. Ct. at 2607 (quoting *Parents Involved*, 551 U.S. at 719). A "heavy" burden that, as the

2

majority explains, rests solely with the State. Maj. Op. at 12; *see also West Virginia v. EPA*, 142 S. Ct. at 2607.

**A.**

Governor Murphy has not carried this formidable burden. The Governor starts by saying he has already taken back the limits on worship. But the Supreme Court has answered that excuse, explaining that "even if the government withdraws or modifies a COVID restriction in the course of litigation," it "does not necessarily moot the case." *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021). Governor Murphy then adds there are no *current* plans to reimpose the capacity limits. A carefully cabined answer more alarming than assuring. Next, he recalls the urgency of COVID-19, reminding us this "unprecedented pandemic" and "rapidly worsening crisis" required a wide "range of social mitigation measures" in March 2020. Response Br. 5–6. Severe circumstances that left no room to accommodate religious services—but not severe enough to close liquor stores and pet shops. **App. 85–86.** Finally, Governor Murphy points to his decision to unilaterally "decline[] to reimpose indoor or outdoor capacity limits on religious gatherings." Response Br. 8. From which we must infer that he and the New Jersey Attorney General consider the First Amendment subordinate to their emergency powers, powers they may or may not "decline" to exercise against religious worship. They will let us all know when the time arrives.

Respectfully, that is not how the voluntary cessation doctrine works, a point emphasized by the Supreme Court mere months ago in *West Virginia v. EPA*. There, the Court considered whether a proposed rule to regulate carbon dioxide

3

fit within the authority provided by Congress. When faced with a challenge, the Government announced plans to change course and promised to promulgate a new regulation. A proposal, the Government claimed, that "mooted the prior dispute." 142 S. Ct. at 2607. Not so, said the Court, because "the Government's mootness argument boils down to its representation that EPA has no intention of enforcing" the old plan. *Id.* That does not shoulder the "heavy burden" of showing "it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (citation omitted). Indeed, the Government in that case "nowhere suggested that if the litigation were resolved in its favor it would not" reimpose the same challenged policy. *Id.* (cleaned up). Instead, it "vigorously defend[ed]" the legality of its proposal. *Id.*

More so here. Governor Murphy does not suggest he has no intention to reimpose limits on worship, only that he has no current plans on the table. Not once has the Governor stated he lacks the power to curtail religious freedoms for emergencies. Nor has the New Jersey Attorney General ever questioned the prosecution of Plaintiffs for violating the challenged Executive Order, a case that lingered until briefing began on this appeal.[1] Or acknowledged the Supreme Court's decisions in *Catholic Diocese* and *Tandon*, which confirm that

---

[1] Oral Argument at 22:50, *Clark v. Governor of N.J.*, __ F.4th __ (3d Cir. 2022) (No. 21-2732), https://www2.ca3.uscourts.gov/oralargument/audio/21-2732_Clarkv.GovernorStateNJ.mp3. The Governor now tries to distance himself from the county prosecutions. But a "county prosecutor's law enforcement function . . . remains at all times subject to the supervision and supersession of the State." *Yurick v. State*, 184 N.J. 70, 79 (2005) (cleaned up).

4

emergencies do not permit state action to abandon the promise of freely exercised faith. "Trust me," is all Governor Murphy serves up.

That, of course, is the one answer we have not accepted. Take our recent decision in *County of Butler v. Governor of Pennsylvania*, 8 F.4th 226 (3d Cir. 2021), *cert. denied*, 142 S. Ct. 772 (2022), where we considered a challenge to Pennsylvania's COVID-19 orders closing businesses and limiting secular gatherings. A moot challenge, we explained, because the "Governor's orders are no longer in effect *and . . .* he has been stripped of his power to unilaterally act in connection with this pandemic." *Id.* at 230 (emphasis added). Or consider our analysis in *Hartnett*. There, teachers challenged a Pennsylvania statute allowing unions to collect fees from nonmembers. While the lawsuit progressed, the Supreme Court invalidated a similar statute, a change of law the parties agreed made Pennsylvania's law unenforceable. That, we held, satisfied the mootness exception. We explained that once the Supreme Court spoke, "the unions immediately stopped collecting agency fees." *Hartnett*, 963 F.3d at 307. And the unions "*conceded* that Pennsylvania's agency-fee arrangement violates the First Amendment and have *forsworn* collecting fees from nonmembers." *Id*. (emphasis added). The holdings in *Butler* and *Hartnett* both turn on external legal constraints on the defendant's prior conduct, where "the claims became moot for reasons outside the parties' control." *Butler*, 8 F.4th at 232. Whether that new law is decisional, statutory, or constitutional, it is strong evidence that informs our focus "on whether the defendant made that change unilaterally and so may 'return to [its] old ways' later on." *Hartnett*, 963 F.3d at 307 (quoting *City of Mesquite*, 455 U.S. at 289 n.10) (alteration in original).

5

Nothing of the sort has occurred here: no concessions of illegality, no foresworn future restrictions, no divesting of power. Governor Murphy retains his statutory authority to act at his pleasure. The state's Constitution has not been altered, and no court, including ours, has stepped up to consider the rights reserved by the First Amendment. Respectfully, that has never been enough to evade the powers vested in the judiciary by Article III. And I see three problems that will likely follow our holding today.

**B.**

First, while the majority invokes the old mootness test, it applies something softer. The majority points out that it must be "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Parents Involved*, 551 U.S. at 719 (emphasis added). But the majority only recites this standard, rather than rigorously holding the Governor to his "formidable burden," *Hartnett*, 963 F.3d at 307, permitting him to dismiss, not defend, his decisions. Instead, the majority rests on its doubt "that the State will tempt fate by reimposing restrictions disfavoring religion." Maj. Op. at 21. That flips the holdings of *West Virginia v. EPA* and a host of prior decisions,[2] recasting the heavy burden of absolute certainty with the light

---

[2] What the majority points to as a distinction between this case and *West Virginia v. EPA* is in fact a similarity. The majority notes that the Court there did not find the dispute moot in part because "the government was unwilling to say it would not impose the policy again." Maj. Op. at n.13. I agree. And the Government here has been similarly coy.

6

weight of mere skepticism and setting a much lower hurdle for the Governor to clear.

Second, the majority repeats the error of the District Court and conflates two separate mootness exceptions that carry two distinct burdens. On the one hand, there are cases in which the plaintiff's alleged injury has disappeared through no action of the defendant. That will make the matter moot unless the plaintiff can show the duration of the challenged action is too short to be fully litigated and "there is a reasonable expectation that the same complaining party will be subjected to the same action again." *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1540–41 (2018) (citation omitted). This is the "capable of repetition, yet evading review" exception. *Id.* at 1540 (citation omitted). And the burden of showing the issue is "capable of repetition" rests only with the plaintiff. Voluntary cessation, on the other hand, places that "heavy burden" on the defendant. *West Virginia v. EPA*, 142 S. Ct. at 2607.

The majority yokes the wrong party.[3] The opinion repeatedly looks to the facts in *Butler*. But that case involved the "capable of repetition" exception, not voluntary cessation. And the former "applies only in exceptional situations," where the burden rests with the plaintiff. *Butler*, 8 F.4th at 230–31 (citation omitted). That allocation makes all the difference. The plaintiffs, we explained, could not carry their burden because Pennsylvania changed the law to prevent the same measures

---

[3] Indeed, the majority explicitly shifts the burden from the Governor to the challengers, concluding that "Appellants offer nothing more than speculation to suggest that we have a live controversy here." Maj. Op. at 24.

7

from returning. *Id.* at 232. Nor did they offer anything to rebut the Commonwealth's representations "that the public health landscape has so fundamentally changed" that future policies would not resemble the past. *Id.* at 231. A point, we noted, "[p]laintiffs here have given us little reason to disbelieve." *Id.*

Here, of course, there is every reason. That is the purpose of the heavy burden against accepting voluntary cessation claims on no more than the moving party's say-so. Perhaps a presumption of governmental good-faith has some application in "capable of repetition" cases challenging state actions like *Butler*; the burden is already on the plaintiff who must offer facts showing "a reasonable expectation . . . [they] will be subject to the same action again." *Id.* at 231 (citation omitted). Extending that "presumption," if it truly exists,[4] to voluntary cessation would give governmental actors the keys to get out of almost any lawsuit simply by citing their own good intentions. The result in *West Virginia v. EPA* confirms that is not correct.

---

[4] *Butler* relies on *Marcavage v. National Park Service*, 666 F.3d 856, 861 (3d Cir. 2012) for the proposition that "[w]e generally presume that government officials act in good faith." *Butler*, 8 F.4th at 230. Language *Marcavage* borrowed from *Bridge v. United States Parole Commission*, 981 F.2d 97, 106 (3d Cir. 1992). But *Bridge* took that concept from the dissenting opinion in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), neglecting, it seems, to note that it is a dissenting view. Neither *Bridge*, a case about parole eligibility calculations, nor *Ward*, a First Amendment challenge to noise permits, involves mootness. All making for a most shaky foundation, one we should not casually extend into questions about Article III.

8

Finally, Plaintiffs, like the almost nine million residents of New Jersey, still do not know whether the First Amendment protects their religious obligations and faith tenets, even though at the Founding, "the right to religious liberty . . . was universally said to be an unalienable right." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1900 (2021) (Alito, J., concurring) (citation omitted); *see also* Vincent Phillip Muñoz, Religious Liberty and the American Founding 229 (2022) ("[T]he Founders declared religious liberty to be an inalienable natural right."). A chilling prospect because Executive Order 107 treats religious exercise worse than comparable secular activity. Comparability "must be judged against the asserted government interest that justifies the regulation at issue," and is "concerned with the risks various activities pose, not the reasons why people gather." *Tandon*, 141 S. Ct. at 1296 (citation omitted). In *Tandon*, the Court found "at-home religious exercise" comparable to retail shopping. *Id.* at 1297. Here, Governor Murphy's "severe in-person gathering restrictions," Maj. Op. at 16, accommodated alcohol, protected pets, and honored home improvement, but found spaces for safe worship non-essential. That imposed "differential burdens favoring secular over religious gatherings," *id.*, demanding the Governor show a narrowly tailored restriction serving a compelling state interest. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).

It is unclear why Governor Murphy urgently needs to shut down synagogues, churches, and mosques en masse while finding room to accommodate a laundry list of businesses. The majority implies answering that question can wait, rationalizing that it is "hard to imagine" a health emergency presenting the State an opportunity to reimpose the ban on

9

religious worship. Maj. Op. at 17. But no lively imagination is needed to conjure up future competitions between public health and religious liberty given the volatility of respiratory viruses,[5] the increased probability of future pandemics,[6] and the routine declaration of "emergencies" by Governor Murphy.[7] I would take the opportunity to provide an answer now, giving the people of New Jersey, and its representatives, the guidance they are entitled to under the Constitution.

## II.

COVID-19 did not change the standards for mooting a case or controversy arising under the laws of the United States. Governor Murphy elected to use an emergency power to eliminate public religious worship. He has not carried the

---

[5] *See, e.g.*, Jamie Crow, *Telltale Signs of a 'Tripledemic'*, Johns Hopkins Coronavirus Resource Center (Nov. 3, 2022), https://coronavirus.jhu.edu/from-our-experts/ telltale-signs-of-a-tripledemic ("[W]e're starting to see an uptick in some [COVID] variants that are probably among the most immune-evasive variants that we've seen.").

[6] "Based on the increasing rate at which novel pathogens such as SARS-CoV-2 have broken loose in human populations in the past 50 years, . . . the probability of novel disease outbreaks will likely grow three-fold in the next few decades." Michael Penn, *Statistics Say Large Pandemics Are More Likely Than We Thought*, Duke Global Health Institute (Aug. 23, 2021), https://globalhealth.duke.edu/news/statistics-say-large-pandemics-are-more-likely-we-thought.

[7] Some eighteen since 2018. *See Executive Orders*, State of New Jersey, https://nj.gov/infobank/eo/056murphy/ approved/eo_archive.shtml (last visited Nov. 22, 2022).

formidable burden of showing, with absolute clarity, there is no reasonable probability he will not do so again. Respectfully, we should decide whether the Governor's actions satisfy the First Amendment before the next emergency arrives.