# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE COVID-RELATED RESTRICTIONS ON RELIGIOUS SERVICES | ) ) ) ) | C.A. No. N23C-01-123 MAA |

Submitted: May 31, 2023
Decided: August 28, 2023

*Upon Defendant Governor John Carney's Motion to Dismiss:*
**GRANTED.**

## <u>OPINION</u>

Stephen J. Neuberger, Esquire (Argued), and Thomas S. Neuberger, Esquire, of THE NEUBERGER FIRM, P.A., Wilmington, Delaware, Thomas C. Crumplar, Esquire, of JACOBS & CRUMPLAR, P.A., Wilmington, Delaware, Scott D. Cousins, Esquire, of COUSINS LAW LLC, Wilmington, Delaware and Martin D. Haverly, Esquire, of MARTIN D. HAVERLY, ATTORNEY AT LAW, Wilmington, Delaware, Attorneys for Plaintiffs.

Andrew D. Cordo, Esquire (Argued), Daniyal M. Iqbal, Esquire, and Nora M. Crawford, Esquire, of WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware, Attorneys for Defendant.

**Adams, J.**

**INTRODUCTION**

Over three and a half years ago, on January 7, 2020, public health officials in China identified a novel coronavirus which was causing an outbreak of atypical pneumonia in the city of Wuhan.[1] Shortly thereafter, this virus was identified as the SARS CoV-2 virus.[2] "COVID-19" was the official name given for the outbreak of this coronavirus.[3] On March 11, 2020, the World Health Organization declared that the spread of COVID-19 was a pandemic.[4] In March 2020, the COVID-19 virus began rapidly spreading across the U.S.[5]

This case centers around several restrictions (the "Challenged Restrictions" or "Restrictions") that the Governor of Delaware, John C. Carney, Jr. (the "Governor"), put in place between March through May 2020 to mitigate the spread of COVID-19. The two Plaintiffs, who are church pastors, originally filed their complaint in the Court of Chancery and transferred the complaint to this Court after it was dismissed for lack of subject matter jurisdiction. Plaintiffs claim the Challenged Restrictions violated their rights pursuant to the First Amendment to the United States

---

[1] *CDC Museum COVID-19 Timeline,* CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/museum/timeline/covid19.html#:~:text=January%2010%2C%202020&text=CDC%20publishes%20information%20about%20the,2%20virus%20on%20its%20website (last reviewed Mar. 15, 2023).
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] *See COVID Data Tracker,* CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last updated Aug. 12, 2023).

Constitution and Article I, Section 1 of the Delaware Constitution. Plaintiffs also claim the Restrictions violated their right to equal protection pursuant to the Fourteenth Amendment to the U.S. Constitution. Before the Court is Defendant's motion to dismiss the complaint. For the reasons that follow, Defendant's motion is GRANTED.

## FACTS

### I. The State of Emergency

On March 11, 2020, the World Health Organization declared that the COVID-19 outbreak had caused a global pandemic.[6] On March 13, 2020, the Governor issued a "Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat" (the "Emergency Declaration" or "Declaration").[7] The Emergency Declaration advised event hosts to "cancel all 'non-essential mass gatherings' of 100 people or more" and recommended that "those at highest risk (over age 60 and with chronic health conditions) not attend large gatherings."[8] The Declaration advised that if any large gathering took place, that individuals should take certain precautions to reduce the spread of the virus. Aside from guidance specific to schools, and senior living and care facilities, the Declaration did not

---

[6] The facts are drawn from the complaint, documents incorporated by reference, and publicly available information subject to judicial notice. *See In re Santa Fe Pac. S'holder Litig.*, 669 A.2d 59, 69-70 (Del. 1995).

[7] Mot. to Dismiss, Ex. 1; Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat ("Decl.").

[8] Decl. ¶ 6.

3

prescribe specific rules for businesses or gatherings of fewer than one hundred people.[9]

## II. The Governor's Authority Pursuant to the Emergency Management Act

The Governor's authority to declare this state of emergency was derived from the Emergency Management Act.[10]  Pursuant to 20 *Del. C.* § 3115(a), the Governor is "responsible for addressing the dangers to life, health, environment, property or public peace within the State presented by emergencies or disasters . . . ."[11]  Section 3115(c) grants the Governor the power to proclaim a state of emergency.  It provides:

> In addition to the powers conferred upon the Governor by this chapter, a state of emergency may be proclaimed by emergency order of the Governor upon a finding that an emergency or disaster has occurred or that such occurrence or threat of that occurrence is imminent.  The state of emergency shall continue until the Governor finds that the threat or danger has passed or the emergency or disaster has been dealt with to the extent that conditions necessitating a state of emergency no longer exist and terminates the state of emergency by subsequent order.  No state of emergency can continue for more than 30 days without being renewed by the Governor.[12]

"[T]he Governor may issue, amend and rescind all necessary executive orders, emergency orders, proclamations and regulations, which shall have the force and effect of law."[13]  The Act further provides that the Governor may "[t]ake such other

---

[9] *See* Decl. ¶¶ 7-8.
[10] 20 *Del. C.* § 3115.
[11] *Id.* § 3115(a).
[12] *Id.* 3115(c).
[13] *Id.* § 3115(b).

actions as the Governor reasonably believes necessary to help maintain life, health, property or public peace."[14]

As the rate of infection and death toll caused by the pandemic increased over the next several weeks, the Governor issued a series of modifications to the Emergency Declaration which are summarized herein.[15]

## III.    The Challenged Restrictions

Between March 22 and June 2, 2020, the Governor issued several emergency orders and restrictions to limit the spread of COVID-19.   The Challenged Restrictions limited the number of attendees and restricted the activities in houses of worship ("Houses of Worship").

### A. The Fourth Modification

On March 22, 2020, the Fourth Modification set restrictions specific to "Essential Businesses," which included Houses of Worship.[16] This modification stated that Essential Businesses were "subject to the requirements of existing emergency orders[] . . . ." which included the Second Modification to the Emergency

---

[14] *Id.* § 3116(b)(13).
[15] This decision does not include every modification to the Emergency Declaration but only those pertinent to addressing Plaintiffs' claims.
[16] Compl., Ex. B at 3-4, 15-16; Off. of the Governor John Carney, Fourth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat ¶ 1 (Mar. 22, 2020, 4:00 PM), available at https://governor.delaware.gov/health-soe/fourth-state-of-emergency/  (the "Fourth Modification").  Citations to Complaint Exhibits refer to Exhibits attached to the complaint in the previous Court of Chancery action, captioned: C.A. No. 2021-1037-JTL.

Declaration.[17] The Second Modification mandated that "organizers and sponsors of public gatherings of 50 or more people shall cancel the gatherings immediately and not reschedule them until after May 15, 2020, or the public health threat of COVID-19 has been eliminated."[18] The Fourth Modification included a list of mandates and restrictions, titled "Responsibilities of Essential Businesses," which included adherence to the guidance set forth on social distancing, cleaning, and sanitizing.[19] The Fourth Modification stated that it had "the force and effect of law," and that "[a]ny failure to comply with [its] provisions . . . constitutes a criminal offense."[20]

### B. The Ninth Modification

On April 1, 2020, the Ninth Modification limited in-person gatherings to ten people "until after May 15, 2020 or the public health threat of COVID-19 has been eliminated."[21] The Ninth Modification included an exception for "gatherings of employees engaged in work at [E]ssential [B]usinesses[,]" but specified that the requirements for hand hygiene and social distancing remained in effect.[22] By the

---

[17] Fourth Modification ¶ 6(q)(12).
[18] Off. of the Governor John Carney, Second Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat ¶ 1 (Mar. 18, 2020, 2:00 PM), available at https://governor.delaware.gov/health-soe/second-state-of-emergency/ (the "Second Modification").
[19] Fourth Modification ¶ 5.
[20] *Id.* ¶ 9.
[21] Compl., Ex. D ¶ 1; Off. of the Governor John Carney, Ninth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat ¶ 1 (Apr. 1, 2020, 3:00 PM), available at https://governor.delaware.gov/health-soe/ninth-state-of-emergency/ (the "Ninth Modification").
[22] Ninth Modification ¶ 1.

terms of the Ninth Modification, Essential Businesses could allow no more than twenty percent of stated fire occupancy requirements in the building at one time and no more than ten percent during exclusive hours for high-risk populations.[23]

## C. The Tenth Modification

On April 6, 2020, the Governor issued the Tenth Modification to the Declaration.[24] This modification ordered that Houses of Worship "comply with all social distancing requirements set forth in the COVID-19 State of Emergency declaration and all modifications, including attendance of no more than 10 people for in-person services under any circumstances."[25] Out of the 237 categories of Essential Businesses that the State of Delaware identified, only Houses of Worship were subject to this ten person restriction.[26] Other organizations deemed Essential Businesses were only subject to the twenty percent restriction within the same industry subsector.[27]

---

[23] *Id.* ¶ 2(a).

[24] Compl., Ex. E at 13; Off. of the Governor John Carney, Tenth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat (Apr. 6, 2020, 6:00 PM), available at https://governor.delaware.gov/health-soe/tenth-state-of-emergency/ (the "Tenth Modification").

[25] Tenth Modification ¶ 1.

[26] *Id.*

[27] *Compare id*, *with* Ninth Modification ¶ 2(a). For a summary of the April Worship Guidance issued by the Delaware Division of Public Health on April 7, 2020, see *In re COVID-Related Restrictions on Religious Servs.*, 285 A.3d 1205, 1215 (Del. Ch. 2022) (hereinafter "Chancery Action").

## D. The Eighteenth Modification

On May 18, 2020, the Eighteenth Modification provided that Houses of Worship could either hold: (1) "in-person services and gatherings of 10 or fewer people"; or (2) "in-person services and gatherings" of up to 30% capacity only if all attendees could observe CDC social distancing guidelines.[28]  These modifications included four pages of restrictions on the operation of Houses of Worship.[29]  These restrictions included prohibiting: communion, baptism, worship over 60 minutes, preachers without masks, and service on 6 out of 7 days each week.[30]  Although the Governor banned the touching requirement for baptisms, he issued no such restrictions on Jewish circumcisions.[31]

## E. The Bullock Action and the Nineteenth Modification

On May 19, 2020, Reverend Dr. Christopher Alan Bullock ("Bullock") filed a lawsuit against the Governor in the United States District Court for the District of

---

[28] Compl., Ex. J ¶ A; Off. of the Governor John Carney, Eighteenth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat (May 18, 2020, 12:30 PM), available at https://governor.delaware.gov/health-soe/eighteenth-state-of-emergency/ (the "Eighteenth Modification").  The Delaware Division of Public Health also issued the May Worship Guidance on the same date. For a summary of this guidance, see Chancery Action, 285 A.3d at 1216-18.

[29] *See* Compl., Ex. K (the "May Worship Guidance").

[30] *See id.*

[31] *Id.* at 4.

Delaware ("the District Court").[32]   Bullock sought injunctive relief, including a temporary restraining order ("TRO").[33]

On May 22, 2020, the Governor issued the Nineteenth Modification which eliminated the "Essential" versus "Non-essential" categorization of businesses and replaced it with industry-specific guidance found in the Delaware Phase 1 Reopening Plan.[34]   Under this Modification, Houses of Worship could operate at 30% of their permitted fire occupancy.[35]

On May 28, 2020, the District Court denied Bullock's request for a TRO noting that the relief Bullock requested was actually more restrictive than the current Reopening Worship Guidance and because he had not established a threat of "irreparable harm" required to grant a TRO.[36]   The United States Court of Appeals for the Third Circuit affirmed the denial of the TRO.[37]

---

[32] *Bullock v. Carney,* 463 F. Supp. 3d 519 (D. Del. 2020).

[33] *Id.* at 523-24.

[34] Compl. ¶¶ 166-67, Ex. M; Off. of the Governor John Carney, Nineteenth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat (May 22, 2020, 4:00 PM), available at https://governor.delaware.gov/health-soe/nineteenth-state-of-emergency/ (the "Nineteenth Modification"); *see* Governor John Carney, Delaware's Reopening, https://governor.delaware.gov/wp-content/uploads/sites/24/2020/06/Delaware-Economic-Reopening-PHASE-1_Revised-6.6.20.pdf (revised June 6, 2020) (the "Phase One Plan").

[35] Phase One Plan at 23.

[36] *Bullock,* 463 F. Supp. 3d at 523-25.

[37] *Bullock v. Carney,* 806 Fed. App'x 157 (3d Cir. 2020), *amended and superseded by Bullock v. Carney*, 2020 WL 7038527 (3d Cir. June 4, 2020).

## F. The Twentieth and Twenty-First Modifications

On May 31, 2020, the Governor issued the Twentieth Modification.[38]  This Modification eliminated the restrictions in the Eighteenth Modification with respect to Houses of Worship and provided that the thirty percent capacity limit remained in effect, as it did for other Essential Businesses.[39]  There have been no restrictions issued for Houses of Worship since the Twentieth Modification.  Plaintiffs concede that, as of June 2, 2020, the "offending Orders governing religious rituals [had been] abandoned."[40]  On June 14, 2020, the Governor issued the Twenty-first Modification, which increased the capacity limit for Essential Businesses, including Houses of Worship to sixty percent.[41]

## G. The Bullock Settlement

On November 10, 2020, the parties to the Bullock Action reached a settlement.  By the terms of the Settlement Agreement, the Governor agreed "not to impose restrictions that specifically target[ed] [H]ouses of [W]orship," including but not limited to a restriction limiting gatherings in Houses of Worship to ten persons.

---

[38] *See* Off. of the Governor John Carney, Twentieth Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat (May 31, 2020, 3:30 PM), available at https://governor.delaware.gov/health-soe/twentieth-state-of-emergency/ (the "Twentieth Modification").

[39] *Id.* ¶ D.

[40] Compl. ¶ 107.

[41] Off. of the Governor John Carney, Twenty-first Modification of the Declaration of a State of Emergency for the State of Delaware Due to a Public Health Threat ¶ D (June 14, 2020, 5:00 PM), available at https://governor.delaware.gov/health-soe/twenty-first-state-of-emergency/ (the "Twenty-first Modification").

## H. The Governor ends the State of Emergency

On July 13, 2021, the Governor ended the State of Emergency and terminated all of the restrictions in the Emergency Declaration, and their modifications.

## I. The Court of Chancery Action

On December 1, 2021, approximately eighteen months after the Twentieth Modification lifted the restrictions on Houses of Worship, Pastor Alan Hines of the Townsend Free Will Baptist Church and Reverend David W. Landow of Emmanuel Orthodox Presbyterian Church filed separate actions in the Court of Chancery.[42] Plaintiffs claimed the Challenged Restrictions violated their rights under both the Delaware and United States Constitutions. Plaintiffs consolidated the complaints on December 23, 2021.[43] Plaintiffs' action in the Court of Chancery sought the following remedies: (1) a declaratory judgment regarding the constitutionality of the Challenged Restrictions, (2) a permanent injunction against the Governor and his successors to prevent them from enacting similar future restrictions, and (3) nominal and compensatory damages.[44] The "primary" relief requested in the Court of Chancery action was a permanent injunction.[45]

---

[42] Chancery Action, 285 A.3d at 1222.
[43] *See* C.A. No. 2021-1036-JTL, D.I. 16 (hereinafter "Court of Chancery Compl.").
[44] Chancery Action, 285 A.3d at 1209.
[45] Court of Chancery Compl. ¶¶ 3, 12, 320.

On November 21, 2022, the Court of Chancery dismissed Plaintiffs' consolidated complaint for lack of subject matter jurisdiction. The Court held that the request for injunctive relief was not justiciable because "Plaintiffs cannot meet the operative standard" of demonstrating a "reasonable apprehension that the Governor would engage in conduct that would warrant a permanent injunction."[46] The Court stated that the possibility of future COVID-19-induced harm to Houses of Worship was "speculative at best."[47]

## PROCEDURAL HISTORY

Plaintiffs transferred this action to the Superior Court pursuant to 10 *Del. C.* § 1902 and on January 24, 2023, filed the operative Complaint on this Court's docket.[48] Plaintiffs allege violations of the following constitutional rights:

- Count I: Article I, Section 1 of the Delaware Constitution;

- Count II: the Free Exercise Clause of the First Amendment of the United States Constitution;

- Count III: Free Speech, Free Exercise, Free Assembly, Freedom of Association pursuant to the First Amendment of the United States Constitution;

---

[46] Chancery Action, 285 A.3d at 1233-34.
[47] *Id.* at 1234.
[48] Plaintiffs in this action filed the exact same complaint, including a request for injunctive relief, as they did in the Chancery Action.

12

- Count IV: Freedom from establishment of religion pursuant to the First Amendment of the United States Constitution; and

- Count V: Equal Protection pursuant to the Fourteenth Amendment of the United States Constitution.[49]

As relief, Plaintiffs request nominal and compensatory damages, and a declaratory judgment.  Defendant filed a motion to dismiss on April 14, 2023. Defendant asserts that Plaintiffs' claim for damages for violations of their civil rights pursuant to the U.S. and Delaware Constitutions should be dismissed because it is barred by the doctrine of qualified immunity and the State Tort Claims Act ("STCA").  With respect to Plaintiffs' request for a declaratory judgment, Defendant argues Plaintiffs claims are not justiciable because there is no actual case or controversy, and because Plaintiffs lack standing.[50]  Briefing concluded on May 18, 2023. The Court held oral argument on May 31, 2023 and reserved decision.

## STANDARD OF REVIEW

### I.    Rule 12(b)(1) applies to Plaintiffs' standing argument.

Defendant argues that Plaintiffs' claims should be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction because they are not justiciable.  The court may review motions to dismiss based on standing pursuant to Rule 12(b)(1) or

---

[49] Compl. ¶¶ 190, 266, 281, 290, 307.
[50] Opening Br. at 27-35; Reply Br. at 2.

12(b)(6) depending on the circumstances of the case. Whether Rule 12(b)(1) or 12(b)(6) applies depends on whether "the issue of standing is related to the merits."[51]

When "the jurisdictional facts are intertwined with facts central to the merits of the dispute," Courts should adjudicate the issue of standing pursuant to Rule 12(b)(6).[52] In other words, when the defendant is arguing that the court cannot grant relief to a plaintiff in a particular case because this particular plaintiff has not pleaded an essential element of the claim, the motion is properly decided under Rule 12(b)(6).[53] When the defendant is arguing, however, that the court would not have the authority to grant the relief requested to *any* plaintiff, it should be decided pursuant to Rule 12(b)(1).[54]

The standing issue presented in this case relates solely to the Court's ability to redress Plaintiffs' alleged injury; it does not relate to whether Plaintiffs have suffered an injury-in-fact or whether Defendant's actions caused that injury. Defendant argues that, regardless of the particular plaintiff who filed this claim, the

---

[51] *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1280, 1283-84, n.7, n.8 (Del. 2007) (noting that state and federal courts are divided as to whether the issue of standing is properly challenged under Rule 12(b)(1) or 12(b)(6)); *see RBC Capital Mkts., LLC v. Educ. Loan Tr. IV,* 87 A.3d 632, n.47 (Del. 2014) (reaffirming holding in *Appriva Shareholder litigation Co.* that the standard of review on a motion to dismiss for lack of standing depends on the extent it is intertwined with the merits of a plaintiff's claim(s)); *Dewey v. Arce,* 2020 WL 1698594, n.8 (Del. Ch. Apr. 8, 2020) (quoting *Appriva S'holder Litig. Co.,* 937 A.2d at 1286).

[52] *Appriva S'holder Litig. Co., LLC,* 937 A.2d at 1285 (internal quotation marks and citation omitted).

[53] *Id.*

[54] *Id.*

court could not redress the alleged injury caused by the Restrictions by granting declaratory relief because they are no longer in effect. A declaratory judgment, Defendant argues, would not alter the status quo. The redressability analysis is the same regardless of the particular plaintiff who filed this claim. Because Defendant argues that no plaintiff would have standing to bring these claims due to lack of redressability and because the issue of standing is not sufficiently related to the merits, the Court will evaluate Plaintiffs' standing pursuant to Rule 12(b)(1).[55]

## II. Delaware's Rule 12(b)(6) pleading standard applies to Defendant's motion to dismiss Plaintiffs' Section 1983 claims for damages.

Defendant moves to dismiss Plaintiffs' claims for monetary damages filed pursuant to Delaware Rule of Civil Procedure 12(b)(6). According to Defendant, the Governor is immune from damages for violations of the U.S. Constitution pursuant to the doctrine of qualified immunity, and immune from damages for violations of the Delaware Constitution pursuant to the STCA.

The Court must first determine whether to apply Delaware Superior Court Civil Rule 12(b)(6) or Federal Rule of Civil Procedure 12(b)(6) for Defendant's motions to dismiss Plaintiffs' claims for violations of federal law.[56] As a general matter, Delaware's "reasonable conceivability" threshold applies in Delaware state

---

[55] *See, e.g., Spiro v. Vions Tech., Inc.*, 2014 WL 1245032, at *8 (Del. Ch. Mar. 24, 2014) (reasoning that the issue of standing was jurisdictional where a party is arguing "the court lacks the authority to grant the relief requested by the plaintiff.").

[56] The Court will apply Delaware's Rule 12(b)(6) pleading standard to Plaintiffs' claims for violations of Article I, Section 1 of the Delaware Constitution.

courts, not the "plausibility" threshold articulated in the United States Supreme Court decisions, *Ashcroft v. Iqbal*[57] and *Bell Atlantic Corp. v. Twombly*.[58]

The Delaware Superior Court, however, is "split as to whether to apply [the Delaware or federal pleading standard] to claims brought under Section 1983."[59] Because the pleading standard governs a matter of procedural law, this Court will follow those cases that apply the Delaware standard of review to Section 1983 claims.[60] Applying the Delaware "standard does not, however, render federal precedent meaningless to the analysis of this case."[61] Under both standards, plaintiffs still must show that they have provided sufficient facts to place defendants on notice of the claims against them.[62]

Pursuant to Delaware Rule of Civil Procedure 12(b)(6), the Court must accept all well pled allegations as true.[63] "A complaint's allegations are 'well-pleaded' if they put the opposing party on notice of the claims being brought against it."[64] The

---

[57] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[58] *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 547 (2007); *Dollard v. Callery,* 185 A.3d 694, 703 (Del. Super. 2018) (citing *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings, LLC*, 27 A.3d 531, 536 (Del. 2011) (stating that as a general matter "the lower 'reasonable conceivability' threshold continues to apply [to motions to dismiss] in Delaware state courts").

[59] *Dufresne v. Camden-Wyoming Fire Co., Inc.*, 2020 WL 2125797, at *2, n.9 (Del. Super. May 5, 2020) (*comparing Dollard,* 185 A.3d at 703, *with Eskridge v. Hutchins*, 2017 WL 1076726, at *2 (Del. Super. March 22, 2017)).

[60] *See, e.g., Dollard,* 185 A.3d at 703; *Dufresne,* 2020 WL 2125797, at *2.

[61] *Dollard,* 185 A.3d at 704.

[62] *Id.*

[63] *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978) (internal citation omitted).

[64] *Hale v. Elizabeth W. Murphey Sch., Inc.*, 2014 WL 2119652, at *2 (Del. Super. May 20, 2014) (citing *Precision Air, Inc. v. Standard Chlorine of Delaware, Inc.*, 654 A.2d 403, 406 (Del. 1995));

16

Court "will accept even vague allegations as 'well-pleaded' if they provide defendants notice of a claim."[65] The Court must assess whether the claimant "may recover under any reasonably conceivable set of circumstances susceptible of proof."[66] The court must draw every reasonable factual inference in favor of the non-moving party and must deny the motion to dismiss if the claimant may recover under that standard.[67] Dismissal will not be granted unless a claim is clearly without merit.[68]

## ANALYSIS

Defendant sets forth two arguments for why this Court should dismiss Plaintiffs' claims for monetary damages: (1) pursuant to the doctrine of qualified immunity, the Governor is immune from damages for the alleged violations of Plaintiffs' rights under the U.S. Constitution (Counts II-V); (2) pursuant to the STCA, the Governor is immune from damages for the alleged violations of Plaintiffs' rights under the Delaware Constitution (Count I). Defendant also argues that all of Plaintiffs' claims should be dismissed because they are not justiciable insofar there is no current case or controversy and because Plaintiff lacks standing.

*Bramble v. Old Republic Gen. Ins. Corp.,* 2017 WL 345144, at \*3 (Del. Super. Jan. 20, 2017) (internal citations omitted).

[65] *Dollard,* 185 A.3d at 703 (internal citation omitted).

[66] *Hackett v. TD Bank, N.A.,* 2023 WL 3750378, at \*2 (Del. Super. May 31, 2023) (internal quotation marks and citation omitted).

[67] *Id.*

[68] *Bramble,* 2017 WL 345144, at \*3 (internal citation omitted).

## I. The Governor has qualified immunity from damages resulting from alleged violations of Plaintiffs' rights under the U.S. Constitution (Counts II-V).

### A. The Doctrine of Qualified Immunity

In counts II-V, Plaintiffs allege that the Governor committed acts that violate their constitutional rights pursuant to 42 U.S.C. § 1983 and entitle them to damages. Pursuant to Section 1983, "[e]very person who, under color of any statute . . . of any State . . . subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ." To prevail, a plaintiff must demonstrate: (1) deprivation of a right under the United States Constitution (2) by a person acting under color of State law.[69] If a defendant raises the doctrine of qualified immunity as a defense, Plaintiffs must also establish that the Governor's conduct is not protected by that doctrine.[70] To establish that a government official is not entitled to qualified immunity, a plaintiff must show: (1) that the official's actions "violated a constitutional right" and (2) the "right was clearly established at the time of the alleged violation."[71] The court may analyze these elements in any order.[72]

---

[69] *Dollard,* 185 A.3d at 706. There is no dispute that the Governor was acting under color of law.
[70] *Hunt ex rel. DeSombre v. State, Dep't of Safety & Homeland Sec., Div. of Delaware State Police,* 69 A.3d 360, 365 (Del. 2013); *Case v. Ivey,* 542 F. Supp. 3d 1245, 1269-70 (M.D. Ala. 2021).
[71] *Case v. Ivey,* 542 F. Supp. 3d 1245, 1269 (M.D. Ala. 2021) (quoting *Patel v. Lanier Cty. Ga.,* 969 F.3d 1173, 1188 (11th Cir. 2020)).
[72] *Id.* at 1270 (internal citation omitted).

The purpose of qualified immunity is to "shield[] government officials performing discretionary functions from suits for money damages unless their conduct violates clearly established law of which a reasonable official would have known. It gives government officials the breathing room to make reasonable, even if mistaken, judgments . . . ."[73] Qualified immunity is meant to protect government officials "when their jobs require them to make difficult on-the-job decisions"[74] or when they make "reasonable mistakes about the legality of their actions . . . ."[75] This doctrine "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."[76] "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law."[77]

---

[73] *Mauro v. Cuomo,* 2023 WL 2403482, at *6 (E.D.N.Y. Mar. 8, 2023) (quoting *Nat'l Rifle Assoc. of Am. v. Vullo,* 49 F.4th 700, 714 (2d Cir. 2022)); *Hunt ex rel. DeSombre,* 69 A.3d at 365; *Hanson v. Del. State Pub. Integrity Comm'n*, 2012 WL 3860732, at *15 (Del. Super. Aug. 30, 2012), *aff'd*, 69 A.3d 370 (Del. 2013)

[74] *Mauro,* 2023 WL 2403482, at *7 (quoting *DiBlasio v. Novello*, 413 F. App'x 352, 356 (2d Cir. 2011)).

[75] *Id.* (quoting *Sudler v. City of New York*, 689 F.3d 159, 174 (2d Cir. 2012)); *see also Case,* 542 F. Supp. 3d at 1269 ("Qualified immunity serves to balance 'two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'") (quoting *Pearson v. Callahan,* 555 U.S. 223, 231 (2009)).

[76] *Mauro,* 2023 WL 2403482, at *7 (quoting *Sudler*, 689 F.3d at 174).

[77] *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (per curiam) (alteration in original) (internal quotations omitted).

19

Laws and rights derived from those laws are clearly established if "any reasonable official would understand that his challenged conduct" violates them.[78] Although there does not need to be "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate."[79] A right is clearly established if there is either "binding Supreme Court and Third Circuit precedent or . . . a 'robust consensus of cases of persuasive authority in the Courts of Appeals.'"[80] The right must be clearly established "at the time of the alleged misconduct"[81] and "must be particularized to the facts of the case."[82]

---

[78] *Dollard v. Callery,* 185 A.3d 694, 712-13 (Del. Super. 2018) (citing *Taylor*, 575 U.S. at 825; *Hunt ex rel. DeSombre*, 69 A.3d at 365 (for a right to be "clearly established" it must be "clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.") (alteration in original) (internal quotations omitted); *Pleasant View Baptist Church v. Beshear*, 2021 WL 4496386, at *6 (E.D. Ky. 2021) (the unlawfulness of an official's conduct is only "clearly established" if it was "'beyond debate' when the official acted . . . .") (quoting *DeCrane v. Eckart*, 12 F.4th 586, 599 (6th Cir. 2021)).

[79] *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7-8 (2021); *White v. Pauly*, 580 U.S. 73, 78-79 (2017).

[80] *Benner v. Wolf,* 2021 WL 4123973, at *5 (M.D. Pa. 2021) (quoting *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018) (internal citations omitted)); *District of Columbia v. Wesby,* 138 S. Ct. 577, 590 (2018) ("It is not enough that the rule is suggested by then-existing precedent.").

[81] *Taylor*, 575 U.S. at 825 (internal quotation marks and citation omitted).

[82] *Northland Baptist Church of St. Paul, Minnesota v. Walz,* 530 F. Supp. 3d 790, 806 (D. Minn. 2021) (quoting *White,* 580 U.S. at 79); *Wesby,* 138 S. Ct. at 589-90 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014), then *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)) ("We have repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.' A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" (alteration in original)).

If the claimed right is not clearly established, the defendant is entitled to qualified immunity from damages for civil liability.[83] "[E]ven where the law is clearly established and the scope of an official's permissible conduct is clearly defined," the qualified immunity defense may still shield officials from liability.[84] "[I]f it was objectively reasonable for [the official] at the time of the challenged action to believe his acts were lawful" the official may be entitled to qualified immunity.[85] "Accordingly, the question to be answered is whether a reasonable government officer, confronted with the facts as alleged by [the] plaintiff, could reasonably have believed that his actions did not violate some settled constitutional right."[86]

**B. When the Governor implemented the Challenged Restrictions, the law was not clearly established as to whether these and similar restrictions violated Plaintiffs' rights pursuant to the U.S. Constitution.**

The Governor is entitled to qualified immunity from damages resulting from alleged violations of the First and Fourteen amendments to the U.S. Constitution because the case law had not clearly established that the Challenged Restrictions violated these laws when the Governor issued them. The Governor issued the Fourth Modification on March 22, 2020 and lifted the last Challenged Restriction with the

---

[83] *Hanson v. Del. State Pub. Integrity Comm'n*, 2012 WL 3860732, at *15 (Del. Super. Aug. 30, 2012), *aff'd*, 69 A.3d 370 (Del. 2013).
[84] *Mauro*, 2023 WL 2403482, at *7.
[85] *Id*.
[86] *Id.* (quoting *Cloister East, Inc. v. N.Y. State Liquor Auth.*, 563 F. Supp. 3d 90, 108 (S.D.N.Y. 2021)).

21

Twentieth Modification on June 2, 2020.[87]  In this roughly two-and-a-half month

time period, there was no clear consensus among federal or state courts that the

Governor's actions were unlawful.  In fact, decisions issued around the country

found that, during this time period, the law was wholly unsettled as to whether

officials could issue certain restrictions for the purpose of preventing the spread of

the coronavirus that may have also curtailed individuals' First Amendment or Equal

Protection rights.[88]

---

[87] Compl. ¶ 100.A. "Up to a June 2nd preliminary injunction hearing, Governor Carney refused to abandon his specifically mandated religious procedures . . . ." *Id.*

[88] The following cases involve challenges to COVID-19 related restrictions where the plaintiff(s) alleged violations of the First Amendment, not including violations of the Free Exercise or Establishment clauses: *Mauro,* 2023 WL 2403482, at *6 (finding defendants entitled to qualified immunity because plaintiffs failed to allege violation of clearly established right to unrestricted in-person visitation in a nursing home between March 24, 2020-March 4, 2021); *Hinkle Fam. Fun Ctr., LLC v. Grisham,* 586 F. Supp. 3d 1118, 1128 (D.N.M. 2022) (finding no precedent to suggest that defendants violated clearly established right by enacting challenged orders issued between March-July 2020 that imposed temporary restrictions on recreational facilities and restrictions on travel to address the coronavirus pandemic); *Benner v. Wolf,* 2021 WL 4123973, at *3, 5 (M.D. Pa. 2021) (holding when defendant imposed challenged restrictions between March-June 2020 that ordered closure of some businesses no precedent or persuasive authority held similar restrictions violated clearly established law); *Bastian v. Lamont,* 2022 WL 2477863, at *1, 6-7 (D. Conn. 2022) (holding March and April 2020 executive orders mandating business closures and a policy for spas and salons to provides services at clients' homes did not violate clearly established law when they were issued); *Bojicic v. DeWine,* 569 F. Supp. 3d 669, 677, 692-93 (N.D. Ohio 2021) (holding due to binding precedent it was "irrational" to assert a reasonable health official would have known that March and May 2020 orders mandating business closures and compliance with safety standards violated Supreme Court precedent); *Mader v. Union Township,* 2021 WL 3852072, at *7 (W.D. Pa. 2021) (holding "whether the government could limit First Amendment rights [to physically attend township meetings] by prohibiting in-person gatherings given the ongoing COVID-19 pandemic was not clearly established at the time, or even several months later."); *New Mexico Elks Assoc. v. Grisham,* 595 F. Supp. 3d 1018, 1026-27 (D.N.M. 2022) (holding plaintiffs-fraternal organizations provided no precedent, and that the court found none, to suggest government officials violated any clearly established rights, including equal protection, freedom of expression and assembly, by enacting public health orders beginning in March 2020, which imposed temporary restrictions on public gatherings).

For example, U.S. district courts in *Northland Baptist Church of St. Paul, Minnesota v. Walz*,[89] *Case v. Ivey*,[90] and *Mader v. Union Township*[91] found that defendants were entitled to qualified immunity from the plaintiffs' claims for violations of their First Amendment rights because the plaintiffs did not demonstrate the defendants violated a clearly established right.

In *Northland Baptist Church of St. Paul, Minnesota v. Walz*, the District Court for the District of Minnesota addressed whether the governor was entitled to

---

The following cases involve challenges to COVID-19 related restrictions where the plaintiff(s) alleged violations of Free Exercise and Establishment clauses of the First Amendment, among other First and Fourteenth Amendment rights: *Northland Baptist Church of St. Paul, Minnesota v. Walz,* 530 F. Supp. 3d 790, 806-07 (D. Minn. 2021) (holding defendants entitled to qualified immunity because there was no existing eighth circuit precedent involving sufficiently similar facts establishing restrictions implemented between March-June 2020 limiting building capacity were unlawful at that time); *Case v. Ivey,* 542 F. Supp. 3d 1245, 1269-80 (M.D. Ala. 2021) (holding defendants entitled to qualified immunity on plaintiffs' establishment clause, free exercise, and expressive association claims because allegations did not establish COVID-19 restrictions issued between March-May 2020 violated clearly established law); *Spell v. Edwards,* 579 F. Supp. 3d 806, 810-11, 822-23 (M.D. La. 2022) (holding on remand that governor entitled to qualified immunity on Free Exercise claims brought by plaintiffs, a church and pastor, because the law had not clearly established that governor's orders issued between March-May 2020 limiting indoor gatherings, violated the Free Exercise clause); *Murphy v. Lamont,* 2022 WL 1082609, at *12-14 (D. Conn. 2022) (holding governor entitled to qualified immunity on First Amendment claims because the law had not clearly established that governor's orders issued between March-April 2020 limiting public gatherings, including those at Houses of Worship, violated the First Amendment rights to association, speech, assembly, and religious worship); *Abiding Place Ministries v. Newsom,* 2023 WL 2001125, at *5 (S.D. Cal. Feb. 14, 2023) (holding in part that "there was no clear precedent in March or April 2020 that would have put every reasonable official on notice that promulgating orders restricting in person religious gatherings to slow the spread of the COVID-19 virus was clearly and definitively unconstitutional" under the Establishment clause, Free Exercise, Free Speech, Freedom of Assembly, and the clauses of the U.S. Constitution).

The cases in this footnote constitute an exemplary, not an exhaustive, list of those that have found COVID-19-related restriction did not violate a clearly established right.

[89] 530 F. Supp. 3d at 806-07.
[90] 542 F. Supp. 3d at 1269-80.
[91] 2021 WL 3852072, at *7.

qualified immunity from the plaintiffs' claims for violations of their First Amendment rights.[92] The plaintiffs included two churches and one pastor ("Faith-Based Plaintiffs"), who challenged the governor's executive orders, which limited capacity to fifty percent at Houses of Worship, cosmetology salons, and barber shops.[93] The Faith-Based Plaintiffs alleged the executive orders violated their rights of free exercise, freedom of speech, and freedom of assembly.[94] The court held the governor was entitled to qualified immunity because current Eighth Circuit precedent had not clearly established that the limitations on building capacity were unlawful when they were put in place between March-June 2020.[95] The Faith-Based plaintiffs had not "clearly defined the scope of the constitutional rights that they allege[d] ha[d] been violated, let alone tied those allegations to binding Eighth Circuit precedent or a robust consensus of persuasive authority involving sufficiently similar facts."[96] The court found, therefore, that the governor was not on fair notice that his executive orders violated the First Amendment.[97]

Similarly, in *Case v. Ivey,* the District Court for the Middle District of Alabama addressed whether the governor was entitled to qualified immunity from alleged violations of the plaintiffs' First Amendment rights of free exercise, freedom

---

[92] 530 F.Supp.3d at 806-07.
[93] *Id.* at 799.
[94] *Id.*
[95] *Id.* at 807.
[96] *Id.*
[97] *Id.*

from establishment of religion, and freedom of assembly.[98]  The plaintiffs included two pastors who alleged that the governor's April 2020 order, which restricted worship services to nine socially-distanced people, but only limited other essential business to fifty percent capacity, violated their First Amendment rights.[99]  The plaintiffs also alleged that the governor's May 2020 order which limited capacity to a number that permitted a six-foot distance between all individuals violated their rights.[100]  The court held that the law was not clearly established when the governor issued the aforementioned orders.[101]

In *Mader v. Union Township,* the District Court for the Western District of Pennsylvania also addressed whether various township officials were entitled to qualified immunity from the plaintiffs' claims for violations of their First Amendment right of freedom of assembly.[102]  The plaintiffs were two married couples who alleged that their First Amendment rights were violated when they were prevented from attending a June 24, 2020 township public meeting in person.[103]  On the date of this meeting, the state of Pennsylvania was subject to the governor's reopening phase order, which "limited public gatherings . . . using a proscribed occupancy calculator; mandated masks in all public spaces; and required

---

[98] 542 F. Supp. 3d 1245, 1261-62 (M.D. Ala. 2021).
[99] *Id.* at 1256, 1273.
[100] *Id.* at 1273.
[101] *Id.* at 1275-77.
[102] 2021 WL 3852072 at *7 (W.D. Pa. 2021).
[103] *Id.* at *1-2, 7.

Pennsylvanians to telework where doing so was feasible, among other things."[104]

The court held the officials were entitled to qualified immunity because the officials

had not "violated a clearly established right of which a reasonable township official

would have been aware" when it prohibited in-person access to the meeting,

considering that virtual access was available.[105] Courts have also found that

restrictions issued after this time period did not violate clearly established law.[106]

Courts have found that it is "irrational" or "implausible" that a reasonable

health official would have known that imposing various COVID-19 restrictions

violated Supreme Court precedent.[107] While the Challenged Restrictions in this case

do not have a perfect parallel to those in other cases, courts nationwide have granted

---

[104] *Id.* at *7.

[105] *Id.*

[106] *Pleasant View Baptist Church v. Beshear*, 2021 WL 4496386, at *1, 6 (E.D. Ky. 2021) (holding governor's executive order issued on November 18, 2020 which temporarily halted in person classes for public and private schools, did not clearly violate established right because the Court of Appeals denied the plaintiff's motion for emergency relief pending appeal, in *Danville Christian Academy, Inc. v. Beshear*, 208 L. Ed. 2d 504 (2020), the Supreme Court denied request for emergency relief from the same executive order after the Sixth Circuit in *Commonwealth v. Beshear,* 981 F.3d 505, (6th Cir. 2020) stayed the district court's preliminary injunction, and because of existing circuit split as to constitutionality of various COVID-19-related restrictions) (citing *Pleasant View Baptist Church v. Beshear*, 838 F. App'x 936, 938 (6th Cir. 2020)); *Mauro v. Cuomo,* 2023 WL 2403482, at *1-2, 5 (E.D.N.Y. 2023) (holding New York health advisory in effect between March 24, 2020-March 4, 2021 prohibiting visitation in nursing homes except when medically necessary did not violate plaintiff's rights under the Federal Nursing Home Reform Act because "regulations unambiguously contemplate[d] nursing home facilities placing restrictions on visitation, including visits by immediate family.").

[107] *Hinkle Fam. Fun Ctr., LLC v. Grisham,* 586 F. Supp. 3d 1118, 1129 ("[I]t is simply irrational to assert that a reasonable health official would have known that imposing business closings in response to a pandemic clearly violated Supreme Court precedent.") (quoting *Bojicic v. DeWine,* 569 F. Supp. 3d 669, 692 (N.D. Ohio 2021)); *Bastian v. Lamont,* 2022 WL 2477863, at *7 (D. Conn. 2022) ("[I]t is implausible that 'every reasonable official' would have understood issuing or enforcing public health policies violated the plaintiffs' rights.").

qualified immunity to state officials on motions to dismiss for a wide variety of COVID-19 restrictions put in place during the pandemic.[108]  Considering that the Governor was acting in response to a public health crisis "fraught with medical and scientific uncertainties[,]" he was entitled to broad latitude when deciding how to best limit the spread of the virus.

The Supreme Court did find in *Roman Catholic Diocese of Brooklyn v. Cuomo* that the plaintiffs, a church and synagogue, established they would likely prevail in proving that the occupancy limitations at public places of worship violated the Free Exercise clause of the First Amendment.[109]  Governor Cuomo of New York issued an executive order mandating a ten-person occupancy limit in Houses of Worship located in "red zones," and a twenty-five person occupancy limit for Houses of Worship located in "orange zones."[110]  The Court granted emergency injunctive relief enjoining the enforcement of the order pending appeal in the United States Court of Appeals for the Second Circuit.[111]  This decision, however, was issued on

---

[108] *See Mauro,* 2023 WL 2403482, at *6 (collecting cases where federal courts have "granted state officials qualified immunity at the motion to dismiss stage for restrictions implemented during the COVID-19 pandemic.").

[109] *Roman Cath. Diocese of Brooklyn v. Cuomo,* 141 S. Ct. 63, 66 (2020).  Justices Gorsuch and Kavanaugh issued individual concurring opinions. *Id.* at 69-75.  Chief Justice Roberts filed a dissenting opinion. *Id.* at 75-76.  Justice Breyer filed a dissenting opinion which Justices Sotomayor and Kagan joined. *Id.* at 76-78.  Justice Sotomayor filed a separate dissenting opinion which Justice Kagan also joined. *Id.* at 78-81.

[110] *Id.* at 65-66.

[111] *Id.*  The Court held that the applicants demonstrated a likelihood of success on the merits because the challenged restrictions were not "neutral" or of "general applicability" and therefore would have to satisfy strict scrutiny. *Id.* at 66-67.  The Court also found that further enforcement

November 25, 2020, and therefore did not clearly establish the law between March-June 2020, when the Governor issued the Challenged Restrictions in this case.[112] "In other words, this decision could not have put Defendants on fair notice that the occupancy restrictions on houses of worship were unconstitutional."[113]

## II.   The Governor is immune from damages for alleged violations of Plaintiffs' rights under the Delaware Constitution pursuant to the State Tort Claims Act.

### A. The State Tort Claims Act

In Count I, Plaintiffs seek damages for alleged violations of their rights under Article I, Section 1 of the Delaware Constitution.[114] For the reasons that follow, the Court finds that this claim for damages is barred by the STCA.

---

of the order would cause irreparable harm and that granting the application would not harm the public interest. *Id.* at 67-68.

[112] *Id. See Case v. Ivey,* 542 F. Supp. 3d 1245, 1275 (M.D. Ala. 2021).

[113] *Case,* 542 F. Supp. 3d at 1275 (holding that the Alabama governor's April 3, 2020 order did not violate clearly established law despite its similarities with the restrictions at issue in *Roman Catholic Diocese of Brooklyn v. Cuomo*, because this decision, which found such restrictions violated the First Amendment, was issued months after the challenged restrictions in *Case*); *Murphy v. Lamont,* 2022 WL 1082609, at *13-14 (D. Conn. 2022) (holding plaintiffs' right to free exercise was not clearly established when governor issued orders between March-April 2020 because the Supreme Court's decision in *Roman Catholic Dioceses of Brooklyn* was not issued until November 2020 and the Second Circuit's decision in *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620 (2d Cir. 2020) was not issued until December 2020).

[114] Del. Const. art. I, § 1. "Although it is the duty of all persons frequently to assemble together for the public worship of Almighty God; and piety and morality, on which the prosperity of communities depends, are hereby promoted; yet no person shall or ought to be compelled to attend any religious worship, to contribute to the erection or support of any place of worship, or to the maintenance of any ministry, against his or her own free will and consent; and no power shall or ought to be vested in or assumed by any magistrate that shall in any case interfere with, or in any manner control the rights of conscience, in the free exercise of religious worship, nor a preference given by law to any religious societies, denominations, or modes of worship." *Id.*

Pursuant to the STCA, "State employees are exempt from civil liability for acts or omissions taken in their capacity as such . . . ."[115] The purpose of the STCA is to "discourage law suits which might create a chilling effect on the ability of public officials or employees to exercise their discretionary authority."[116] The STCA is not only a shield from liability, but is also "an entitlement to avoid the burdens of litigation."[117] The questions of qualified immunity, therefore, "must be resolved at the earliest possible stage of litigation."[118] The United States Court of Appeals for the Third Circuit in *In re Montgomery County* articulated the breadth of policy concerns underlying sovereign immunity as follows:

> [T]he right not to stand trial is based on far broader concerns for avoiding the social costs of the underlying litigation, and for ensuring and preserving the effectiveness of government. The concern is that, absent immunity from suit as well as liability, the attention of public officials will be diverted from important public issues. Additionally, qualified individuals might avoid public service altogether, while the threat of litigation may undermine the willingness of those who do serve to act when action is necessary.[119]

---

[115] *Jackson v. Minner,* 2013 WL 871784, at *5 (Del. Super. Mar. 1, 2013), *aff'd,* 74 A.3d 654 (Del. 2013).

[116] *Doe v. Cates,* 499 A.2d 1175, 1180-81 (Del. 1985); *Higgins v. Walls*, 901 A.2d 122, 135 (Del. Super. 2005); *In Re Montgomery Cnty.*, 215 F.3d 367, 374–75 (3d Cir. 2000) ("The Supreme Court's decisions in this area make it clear that an immune official's right to avoid trial is based not on the individual's desire to avoid the personal costs and aggravations of presenting a defense. Rather, the right not to stand trial is based on far broader concerns for avoiding the social costs of the underlying litigation, and for ensuring and preserving the effectiveness of government." (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)).

[117] *J.L. v. Barnes*, 33 A.3d 902, 915 (Del. Super. 2011) (citing *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002)).

[118] *Id.* (citing *Miller v. Clinton Cnty.*, 544 F.3d 542, 547 (3d Cir. 2008)).

[119] *In Re Montgomery County*, 215 F.3d at 374–75 (internal citations omitted).

Pursuant to the STCA, there is a rebuttable presumption that an official's actions were: (1) discretionary; (2) undertaken in "good faith and in the belief that the public interest would best be served thereby;" and (3) undertaken without gross or wanton negligence.[120] If the plaintiff can rebut one or more of these elements, the official is not entitled to immunity under the STCA.

With respect to the first element, Plaintiffs must show that the official's actions were ministerial in nature and that the official did not have discretion when undertaking the act under review. .[121] "Whether an act is discretionary or ministerial is a legal determination"[122] and critical to determining if an official is entitled to qualified immunity.[123] "Discretionary acts are those that require some determination or implementation which allows for a choice of methods, or stated differently, those acts where there are no hard and fast rules as to a course of conduct that one must or

---

[120] 10 *Del. C.* § 4001.  With respect to the first element, the official's actions are discretionary if:

> The act or omission complained of arose out of and in connection with the performance of an official duty requiring a determination of policy, the interpretation or enforcement of statutes, rules or regulations, the granting or withholding of publicly created or regulated entitlement or privilege or any other official duty involving the exercise of discretion on the part of the public officer, employee or member, or anyone over whom the public officer, employee or member shall have supervisory authority.

*Id.*
[121] *Jackson v. Minner,* 2013 WL 871784, at *5-6 (Del. Super. Mar. 1, 2013), *aff'd,* 74 A.3d 654, at *6 (Del. 2013); *J.L.,* 33 A.3d at 914-15.
[122] *Wonnum v. Way,* 2017 WL 3168968, at *3 (Del. Super. July 25, 2017).
[123] *J.L.,* 33 A.3d at 911 (stating whether an act is discretionary or ministerial is a "key question relating to the determination of qualified immunity . . . .").

must not take."[124] When the law provides only a general mandate governing actions

of officials, courts have found that they provide for discretionary decision making.[125]

Ministerial actions or failures to act "are those which are performed in a

prescribed manner, without using individual judgment."[126] Ministerial actions

"'involve less in the way of personal decision or judgment,' are more routine, and

typically involve conduct directed by mandatory rules or policies."[127] An act is more

likely to be ministerial if "the matter for which judgment is required has little bearing

of importance upon the validity of the act."[128] "[T]he Court may find that a duty is

ministerial, but how to carry out the duty is discretionary."[129]

With respect to the second element, officials act in good faith when the act is

taken in furtherance of the public interest.[130] For plaintiffs to rebut this presumption,

---

[124] *Jackson,* 2013 WL 871784, at *6 (quoting *Simms v. Christina Sch. Dist.,* 2004 WL 344015, at *8 (Del. Super. Jan. 30, 2004).

[125] *See Id.* at *5-6 (citing *Higgins v. Walls*, 901 A.2d 122, 143–44 (Del. Super. 2005) (citations omitted)) (finding 11 *Del. C.* § 6504 granted Department of Corrections discretionary authority over the care of inmates because it did not specify how or the manner in which the Department must care for inmates); *Simms* 2004 WL 344015, at *8-9 (holding negligent supervision of employees was discretionary where there was no "hard and fast rule" concerning the manner in which supervisor was to supervise employee); *see infra* n.142 for additional examples.

[126] *Sadler-levoli v. Sutton Bus & Truck Co., Inc.*, 2013 WL 3010719, at *2 (Del. Super. June 4, 2013) (citing *Simmons v. Delaware Tech. & Cmty. Coll.*, 2012 WL 1980409, at *4 (Del. Super. May 17, 2012)) ("Ministerial acts, by contrast are those which a person performs in a prescribed manner without regard to his own judgment concerning the act to be done.") (citation omitted).

[127] *J.L.,* 33 A.3d at 914 (quoting *Sussex Cnty. v. Morris*, 610 A.2d 1354, 1359 (Del. 1992), then citing *Knoll v. Wright*, 544 A.2d 265 (TABLE), 1988 WL 71446, at *1 (Del. Jun. 29, 1988).

[128] *Wonnum v. Way,* 2017 WL 3168968, at *3 (Del. Super. July 25, 2017) (cleaned up).

[129] *Mathangani v. Hevelow,* 2016 WL 3587192, at *4 (Del. Super. May 31, 2016) (citing *Sadler-levoli,* 2013 WL 3010719, at *2).

[130] *Doe v. Cates,* 499 A.2d 1175, n.5 (Del. 1985) (quoting 10 *Del. C.* § 4001) ("The act or omission complained of was done in good faith and in the belief that the public interest would best be served thereby."); *Jackson v. Minner,* 2013 WL 871784, at *6 (Del. Super. Mar. 1, 2013).

they must demonstrate that the official's actions were taken in bad faith.[131]  "Bad faith 'contemplates a state of mind affirmatively operating with furtive design or ill will.'  It is not simply 'bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity.'"[132]

With respect to the third element, the Supreme Court of Delaware has equated "gross negligence" in the civil context as the functional equivalent of "criminal negligence."[133]  In the context of the STCA, the Supreme Court has described gross negligence as "a higher level of negligence representing an extreme departure from the ordinary standard of care"[134] that "signifies more than ordinary inadvertence or inattention."[135]  For an official's conduct to be wantonly negligent, "the conduct must reflect a 'conscious indifference' or 'I don't care attitude.'"[136]

## B. The Governor is immune from damages for alleged violations of the Delaware Constitution because his actions were discretionary.

The Court finds as a matter of law that the Governor is immune from damages pursuant to the STCA for actions taken pursuant to the Emergency Management Act

---

[131] *Doe*, 499 A.2d at 1181 (holding the STCA intends for public officers to "be fully liable where they exercised their authority in a grossly negligent, or bad faith manner."); *Jackson,* 2013 WL 871784, at *6.

[132] *Jackson,* 2013 WL 871784, at *7 (quoting *Brittingham v. Bd. of Adjustment of City of Rehoboth Beach*, 2005 WL 1653979, at *1 (Del. Super. Apr. 26, 2005)).

[133] *Jardel Co., Inc. v. Hughes,* 523 A.2d 518, 530 (Del. 1987).

[134] *Browne v. Robb*, 583 A.2d 949, 953 (Del. 1990) (internal quotation marks and citation omitted).

[135] *Hecksher v. Fairwinds Baptist Church, Inc.,* 115 A.3d 1187, 1199 (Del. 2015) (internal quotations omitted).

[136] *Hughes ex rel. Hughes,* 950 A.2d 659 (TABLE), 2008 WL 2083150, at *3 (Del. 2008) (quoting *Cloroben Chem. Corp. v. Comegys,* 464 A.2d 887, 891 (Del. 1983)).

because those actions were discretionary in nature, and made in good faith without gross or wanton negligence. Plaintiff has not rebutted any of the three elements in the STCA. Before addressing the nature of the Governor's actions in response to the pandemic, the Court will first address the language of the Emergency Management Act itself.

**1. The Emergency Management Act grants the Governor broad discretionary authority to respond to state-wide emergencies.**

The Supreme Court of Delaware held in *Facer v. Carney* that "the Governor's exercise of emergency powers is a discretionary act."[137] The broad language of the Act necessitates that the Governor use his discretion when exercising his power to respond to state-wide emergencies. Section 3115 of the Emergency Management Act provides that the Governor "may issue, amend and rescind *all necessary* executive orders, emergency orders, proclamations and regulations, which shall have the force and effect of law."[138] Section 3115 further provides that the Governor may "[t]ake *such other actions* as the Governor *reasonably believes necessary* to help maintain life, health, property or public peace."[139] The italicized portions of the Act quoted above do not indicate any specific acts that the Governor shall do or refrain from doing to maintain the life or health of Delaware citizens. The Act does not

---

[137] 277 A.3d 937 (TABLE), 2022 WL 1561444, at *1 (Del. 2022).
[138] 20 *Del. C.* § 3115(b) (emphasis added).
[139] *Id.* § 3116(b)(13) (emphasis added).

prescribe with any particularity the actions the Governor must take or is prohibited from taking in response to a state of emergency. There were no "hard and fast rules" prescribing how the Governor had to respond to this type of emergency when he issued the Challenged Restrictions.[140] Section 3115 permits the Governor to exercise broad discretionary authority to take action to address dangers to the life and health of Delaware's citizens caused by emergencies or disasters.[141]

Such a broad grant of discretionary authority necessitates that the Governor exercise his informed judgment to make policy decisions. Considering the nature of state-wide emergencies, a statute that narrowly prescribes governors' authority to respond to such emergencies risks limiting their ability to respond effectively and appropriately. State-wide emergencies can take nearly any form, are often not

---

[140] *Simms v. Christina Sch. Dist.,* 2004 WL 344015, at *8 (Del. Super. Jan. 30, 2004) (finding immediate supervisor's conduct was discretionary because there were no "hard and fast" rules concerning the manner in which he was to supervise a residential advisor).

[141] Delaware courts have found that where laws, guidelines or policies employ broad language that do not narrowly prescribe mandatory actions, they provide for discretionary acts. *See, e.g., Mathangani v. Hevelow,* 2016 WL 3587192, at *4 (Del. Super. May 31, 2016) (holding police officer's action setting up roadblock was discretionary because although there were guidelines in place for road blocks there were no ministerial rules prescribing precisely how this action was to be carried out and officer had to make quick decisions in course of police chase); *Horvat v. State Off. of Mgmt. & Budget,* 2017 WL 5068574, at *8 (Del. Super. Oct. 30, 2017) (holding directive that state personnel "shall perform all necessary tasks to ensure that the assigned areas are clear of snow and ice in a timely manner" provided for discretionary acts because determining when and how to plow the area and deciding whether sufficient walkways had been made for pedestrians involves significant decision making and personal judgment); *Sadler-levoli v. Sutton Bus & Truck Co., Inc.,* 2013 WL 3010719, at *3 (Del. Super. June 4, 2013) (holding "method of supervision of students on a school bus" and "actions that the District took or could have taken prior to students embarking on the bus" were discretionary acts); for an example of a ministerial law, see *Stevenson v. Brandywine Sch. Dist.,* 1999 WL 742932, at *3 (Del. Super. July 9, 1999) ("[T]he decision of how to secure a wheelchair-bound student in a school bus" was not discretionary in nature because it involved a minimal degree of voluntariness and choice).

predictable or expected, may be unprecedented, or of a kind that a state has had no experience with in recent history. Such emergencies may occur quickly and evolve rapidly. The very nature of state-wide emergencies demands that officials be given the flexibility to respond quickly in a manner that best mitigates and prevents further harm, while taking into account countervailing interests. The actions required to respond to emergencies are diverse and will necessarily vary based on the type of emergency. The Governor's authority under the Emergency Management Act is broad so that he may best apply his well-reasoned judgment and tailor the State's response to a novel crisis without having to be overly concerned that his actions might violate the law. The COVID-19 pandemic is precisely the type of unprecedented, unpredictable emergency the Delaware legislature likely contemplated when enacting this statute.

State courts around the country have found that their state's emergency managements acts, which have similar language to the Delaware statute, provided government officials with broad discretion to implement orders to protect the health and safety of its citizens from the COVID-19 pandemic.[142]

---

[142] *See, e.g.*, *Grisham v. Romero,* 483 P.3d 545, 558 (N.M. 2021) (holding governor and secretary had substantial discretion under Public Health Emergency Response Act to issue restrictions on businesses to protect against COVID-19 pandemic); *Beshear v. Acree,* 615 S. W. 3d 780, 812-13 (Ky. 2020) (finding statute granting governor authority to declare a state emergency was necessarily broad, that it guided governor's discretion, and was "appropriately flexible to address a myriad of real-world events," thus granting the governor the authority to issue orders to prevent the spread of COVID-19); *Desrosiers v. Governor,* 158 N.E.3d 827, 835-36 (Mass. 2020) (holding the Massachusetts Civil Defense Act which granted to the governor "all authority over persons

## 2. The Governor's actions were discretionary.

The restrictions that the Governor put in place for Houses of Worship required a determination of policy that balanced the need to reduce the spread of the coronavirus while not unduly infringing upon the civil rights of Delaware's citizens.[143] The threat that the COVID-19 pandemic posed to Delaware's citizens required the Governor to exercise his judgment and balance policy goals that at times came into unavoidable conflict with each other.

Crafting policies that best reduced the spread of the virus while minimizing collateral harm to civil liberties was an incredibly difficult balancing act for several reasons. The nature of transmission of the virus created a formidable challenge to balancing these policy concerns. When the Governor issued the Challenged Restrictions, the CDC guidance advised that the virus spread primarily from one currently infected person to another "who are in close contact with each other . . . ."[144] Specifically, the virus spread "from an infected person's mouth or nose in small

---

and property, necessary or expedient for meeting" a state of emergency provided the governor with expansive discretionary powers in the face of a declared state of emergency); *Snell v. Walz,* 2023 WL 4411059, at * 2, 5, 8 (Minn. Ct. App. July 10, 2023) (holding on remand that Minnesota Emergency Management Act provided the governor with broad authority to declare a state of emergency in response to the COVID-19 pandemic, because the act granted the governor authority to declare a peacetime emergency when an act of nature endangers life and the authority to "make, amend, and rescind the necessary orders and rules to carry out" the Act's provisions).

[143] Plaintiff has not attempted to argue that the Governor's decisions to put in place the Challenged Restrictions were ministerial in nature.

[144] *Coronavirus disease (COVID-19): How is it transmitted?*, WORLD HEALTH ORG., https://www.who.int/news-room/questions-and-answers/item/coronavirus-disease-covid-19-how-is-it-transmitted (last updated Dec. 23, 2021).

liquid particles when they cough, sneeze, speak, sing or breathe."[145] An individual's risk of contracting the virus increases with their proximity to infected individuals—who may or may not know that they are infected—particularly in an indoor setting with little or no ventilation. Applying this available knowledge about the virus' transmission, the Governor put in place policies limiting individuals' ability to gather indoors beyond certain capacities to reduce the rate of transmission. These policies could not completely avoid limiting individual's ability to gather in large groups and commune in the same manner as they had been before the pandemic.[146]

There are several other important reasons that made the Governor's task of mitigating the harm of the pandemic so difficult. COVID-19 was a novel and highly infectious virus. The virus spread easily and quickly, evolving and mutating rapidly.[147] The variants of the virus differed in terms of degree of contagiousness and virulence.[148] In large part because COVID-19 was a novel virus to which no one was immune in the beginning of the pandemic, the fatality rate was relatively

---

[145] *Id.*

[146] *See How to Protect Yourself and Others: Increasing Space and Distance*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html#space (last updated July 6, 2023).

[147] *Omicron, Delta, Alpha, and More: What To Know About the Coronavirus Variants,* YALE MED., https://www.yalemedicine.org/news/covid-19-variants-of-concern-omicron (Feb. 3, 2023) ("One thing we know for sure about SARS-CoV-2, the virus that causes COVID-19, is that it is changing constantly.").

[148] *Id.*

high.[149]  Because the virus was novel, the medical and scientific communities could only learn how to best prevent and treat the infection as the pandemic unfolded.[150] Additionally, the U.S. had no recent experience with combating pandemics – the U.S. had not had a major pandemic approximating the severity of the COVID-19 pandemic since the influenza pandemic of 1918-1919.[151]

Some degree of error on the part of the Governor and other state officials was inevitable, but the Emergency Management Act permits a margin of error for the circumstances the Governor faced.  Considering the imperfect knowledge that the Governor had when making these policy decisions, the nature of transmission, and the need to reduce the alarming rate of infection, it was not practically possible for the Governor to put in place policies that had no negative impact on individuals' freedom of religion, speech, and assembly.

---

[149] As of the issuance of this decision, over one million people in the U.S. have died from the coronavirus. *About COVID-19,* CTRS. FOR DISEASE CONTROL & PREVENTION https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19.html (last updated July 10, 2023).

[150] On January 21, 2020, the CDC announced that the spread of the novel coronavirus "is a rapidly evolving situation" and that it would "continue to update the public as circumstances warrant." *First Travel-related Case of 2019 Novel Coronavirus Detected in United States,* CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/media/releases/2020/p0121-novel-coronavirus-travel-case.html (last reviewed Jan. 21, 2020).

[151] *See 1918 Pandemic (H1N1 virus),* CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/flu/pandemic-resources/1918-pandemic-h1n1.html (last reviewed Mar. 20, 2019).  The total deaths in the U.S. caused by the 1918 influenza pandemic has been estimated at about 675,000. *Id.*
Through August 12, 2023, 1,137,742 people in the U.S. have died from COVID-19. *COVID Data Tracker,* CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#datatracker-home  (last updated Aug. 21, 2023 at 5:00 PM).

### 3. The Governor's actions were taken in good faith without gross or wanton negligence.

As Plaintiffs have not pled that the Governor was not acting in good faith, or that he acted with gross or wanton negligence, the Court finds that the Governor was acting in good faith in furtherance of the public interest, and without gross or wanton negligence.[152]

## III. Plaintiffs' request for a declaratory judgment is not justiciable.

Plaintiffs request that this Court issue a declaratory judgment that the Challenged Restrictions violated their rights under the U.S. and Delaware Constitutions. "[B]efore a court can adjudicate properly a dispute brought before it[]" and decide whether a claim warrants judicial relief, including declaratory relief, "Delaware law requires that a justiciable controversy exist."[153] Defendant argues that two justiciability doctrines—the case or controversy requirement and the standing requirement—are most salient and mandate the dismissal of this case. For

---

[152] Plaintiffs only allege that the Governor "either knew or showed a deliberately indifferent, negligent or reckless disregard" for whether the actions were constitutional." Compl. ¶ 184. This one sentence allegation does not come close to satisfying the standard for alleging gross or wanton negligence. *See*, *e.g.*, *Hughes ex rel. Hughes,* 950 A.2d 659 (TABLE), 2008 WL 2083150, at *3 (Del. 2008).

[153] *Crescent/Mach I Partners, L.P. v. Dr. Pepper Bottling Co. of Texas,* 962 A.2d 205, 208 (Del. 2008) (quoting *Warren v. Moore*, 1994 WL 374333, at *2 (Del. Ch. July 6, 1994)); *Gower v. Trux, Inc.,* 2022 WL 534204, at *12 (Del. Ch. Feb. 23, 2022) (quoting *Lynch v. Gonzalez,* 2020 WL 5648567, at *6 (Del. Ch. Sept. 22, 2020)) ("The court's power to issue declaratory judgments is limited by the well-settled principle that a declaratory judgment must 'address an actual controversy between parties with affected rights.'").

the reasons that follow, the complaint does not constitute a case or controversy and plaintiffs have failed to establish standing.

**A. There is no case or controversy.**

With respect to the case or controversy requirement, Defendant argues that Plaintiffs' claims do not present an actual case or controversy because they do not meet the second through fourth prongs of the *Rollins* test discussed *infra*.

**1. The Declaratory Judgment Act**

The Declaratory Judgment Act applies because Plaintiffs are seeking declaratory relief.[154] This Act grants to Delaware courts the discretion to render a declaratory judgment.[155] Courts may refuse to render declaratory relief if it "will not terminate the uncertainty or controversy giving rise to the proceeding."[156] Delaware courts will also not issue declaratory relief when it can have no practical effect on the injury complained of.[157] Courts also will not grant declaratory judgment "merely to satisfy a party's desire for an advisory opinion or an adjudication of hypothetical

---

[154] 10 *Del. C.* § 6501.
[155] *Id.* § 6506; *see Sprint Nextel Corp v. iPCS, Inc.,* 2008 WL 2737409, at *12-13 (Del. Ch. July 14, 2008).
[156] § 6506.
[157] *Intermec IP Corp. v. TransCore, LP*, 2021 WL 4841131, at *2 (Del. Super. Oct. 18, 2021) (citation omitted) ("Delaware courts do not address disagreements that have no significant current impact.") (internal quotations omitted). Delaware courts will not pronounce that past actions "were right or wrong" when those actions have no "demonstrable continuing effect." *Spencer v. Kemna,* 523 U.S. 1, 18 (1998). Alleged "[p]ast exposure to illegal conduct does not in itself show a present case or controversy . . . ." *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983) (finding past subjection to allegedly illegal chokehold and party's "assertion that he may again be subject to an illegal chokehold does not create the actual controversy that must exist for a declaratory judgment to be entered"). *Id.* at 105.

40

questions."[158]  "Advisory opinions . . . put the court at risk of making incorrect judgments on the basis of insufficiently developed facts, as well as prematurely influencing the development of the law."[159]

When plaintiffs seek declaratory relief against a potential future violation of their rights under the U.S. Constitution, they "'must demonstrate that the probability of that future event occurring is real and substantial [and] of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[160]

## 2. The *Rollins* Test

To determine whether a case presents an actual case or controversy, Delaware courts apply the four-part test first articulated by the Superior Court in *Marshall v.*

---

[158] *Sprint Nextel Corp,* 2008 WL 2737409, at *12 (internal quotations omitted); *Ackerman v. Stemerman,* 201 A.2d 173, 175 (Del. 1964) ("[T]he Declaratory Judgment Act is not to be used as a means of eliciting advisory opinions from the courts.  There must be in existence a factual situation giving rise to immediate, or about to become immediate, controversy between the parties."); *Facer v. Carney,* 277 A.3d 937 (TABLE), 2022 WL 1561444, at *1 (Del. 2022) (affirming trial court's dismissal of writ of mandamus to compel Governor to cease all COVID-19 mandates because issuance of writ based on a hypothetical future pandemic would be tantamount to an advisory opinion); *Gower v. Trux, Inc.,* 2022 WL 534204, at *12 (Del. Ch. Feb. 23, 2022) (quoting *K&K Screw Prods., L.L.C. v. Emerick Cap. Invs., Inc.,* 2011 WL 3505354, at *9 (Del. Ch. Aug. 9, 2011)) ("The case or controversy requirement serves to ensure that an 'application for declaratory relief' does not turn into 'a contingent, speculative venture that would require the Court to issue an advisory opinion.'").
[159] *Manchester v. Narragansett Capital, Inc.,* 1989 WL 125190, at *10 (Del. Ch. Oct. 19, 1989) (citing *Stroud v. Milliken Enters., Inc.,* 552 A.2d 476, 480 (Del. 1989)).
[160] *Anonymous v. State,* 2000 WL 739252, at *4 (Del. Ch. June 1, 2004) (cleaned up).

*Hill*[161] and adopted by the Supreme Court of Delaware in *Rollins Int'l v. Int'l Hydronics Corp.*[162] For a complaint to constitute an actual case or controversy:

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief;
> (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim;
> (3) the controversy must be between parties whose interests are real and adverse; [and]
> (4) the issue involved in the controversy must be ripe for judicial determination[163]

Delaware courts have consistently applied the *Rollins* test to determine whether a complaint constitutes an actual case or controversy.[164] With respect to the second prong, "[a]n actual controversy which justifies resort to the declaratory judgment act exists where one side makes a claim of a present, specific right and the other side makes an equally definite claim to the contrary."[165]

With respect to the ripeness requirement in the fourth prong, Delaware courts apply a framework whereby they "weigh the reasons 'for not rendering a

---

[161] 93 A.2d 524, 525 (Del. Super. 1952).

[162] 303 A.2d 660, 662-63 (Del. 1973) ("We approve the prerequisites of an 'actual controversy' spelled out in *Marshall v. Hill* . . . .").

[163] *Rollins Int'l,* 303 A.2d at 662-63 (citing *Marshall*, 93 A.2d at 525).

[164] *See, e.g., The O'Brien Corp. v. Hunt-Wesson, Inc.,* 1999 WL 126996, at *3-4 (Del. Ch. Feb. 25, 1999); *Stratton v. Am. Indep. Ins. Co.,* 2010 WL 3706617, at *8-9 (Del. Super. Sept. 16, 2010); *Sprint Nextel Corp v. iPCS, Inc.,* 2008 WL 2737409, at *13 (Del. Ch. July 14, 2008); *Stroud v. Milliken Enters., Inc.,* 552 A.2d 476, 479-80 (Del. 1989); *K&K Screw Products, L.L.C. v. Emerick Cap. Invs., Inc.,* 2011 WL 3505354, at *7 (Del. Ch. Aug. 9, 2011); *Bessemer Tr. Co. of Delaware, NA v. Wilson,* 2011 WL 4484557, at *6 (Del. Ch. Sept. 28, 2011); *Gower v. Trux, Inc.,* 2022 WL 534204, at *12 (Del. Ch. Feb. 23, 2022).

[165] *Clemente v. Greyhound Corp.*, 155 A.2d 316, 320 (Del. Super. 1959) (internal citation omitted).

hypothetical opinion . . . against the benefits to be derived from the rendering of a declaratory judgment.'"[166] This balancing of considerations necessarily requires "the exercise of judicial discretion which should turn importantly upon a practical evaluation of the circumstances present."[167] Simply put, for a case to be ripe, the facts must be sufficiently developed for the court to resolve the matter. If the court "would be forced to construct hypothetical factual situations on which [it] could then rule" then the ripeness requirement is not met.[168] Delaware courts address five factors to guide their discretion in determining whether a matter is ripe for adjudication:

> (1) A practical evaluation of the legitimate interests of the plaintiff in a prompt resolution of the question presented;
> (2) the hardship that further delay may threaten;
> (3) the prospect of future factual development that might affect the determination made;
> (4) the need to conserve scarce resources; and
> (5) a due respect for identifiable policies of law touching upon the subject matter in dispute.[169]

---

[166] *The O'Brien Corp.,* 1999 WL 126996, at *4 (quoting *Stroud,* 552 A.2d at 480); *see also Stratton v. Am. Indep. Ins. Co.,* 2010 WL 3706617, at *9 (Del. Super. Sept. 16, 2010) (quoting *Playtex Fam. Prods. Inc. v. St. Paul Surplus Lines Ins. Co.,* 564 A.2d 681, 687 (Del. Super. 1989)) (stating courts must balance "the remedial interests of early resolution of an unripe controversy before actual harm has occurred, and 'those of judicial economy and legal stability which augur for restraint.'").

[167] *The O'Brien Corp.,* 1999 WL 126996 at, *4 (quoting *Schick, Inc. v. ACTWU,* 533 A.2d 1238, 1238–39 (Del. Ch. 1987)).

[168] *Playtex Fam. Prods. Inc.,* 564 A.2d at 688 (internal citation omitted).

[169] *The O'Brien Corp.*, 1999 WL 126996, at *4 (quoting *Playtex Fam. Prods.* 564 A.2d at 687–88).

The Court finds that Plaintiffs have failed to establish an actual case or controversy pursuant to the *Rollins* test and the ripeness factors quoted above. With respect to the third *Rollins* prong, the interests of the parties are not currently adverse. Defendant is currently taking no action to infringe upon those civil rights Plaintiffs claim were harmed by the Challenged Restrictions. Additionally, Plaintiffs admit that they are alleging only past exposure to conduct that violated their rights, which is insufficient to demonstrate that there is a current case or controversy entitling them to declaratory relief.[170] Not only are none of the Challenged Restrictions still in effect, but they have also not been in effect since June 2, 2020, well before Plaintiffs transferred the action to this court. The court will not issue declaratory relief if doing so does nothing more than "pronounc[e] that past actions which have no demonstrable continuing effect were right or wrong."[171] The Court can have no influence on the alleged past harm caused by the Restrictions when they have already been terminated years ago.

To issue declaratory relief at this juncture is tantamount to issuing an advisory opinion because it would have no practical impact or effect on the status quo. Such a declaration could only comment on whether the terminated restrictions caused past harm, but it would do nothing to change what the Governor is currently doing or not

---

[170] *See City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983).
[171] *Spencer v. Kemna*, 523 U.S. 1, 18 (1998).

44

doing.  Because the Restrictions have been terminated and because the alleged harm is not ongoing, the facts of this case are insufficiently developed.  Adjudicating the merits of this dispute "risk[s] . . . making incorrect judgments [and] . . . prematurely influencing the development of the law."[172]  Furthermore, any possibility that the Challenged Restrictions or similar restrictions will be put in place again is hypothetical and highly speculative.[173]

### B. Plaintiffs do not have standing to bring their claims.

For a party to invoke their right to the court's jurisdiction to redress a grievance, they first must establish that they have standing.[174]  "Standing is a threshold question that must be answered by a court affirmatively to ensure that the litigation before the tribunal is a 'case or controversy' that is appropriate for the

---

[172] *Manchester v. Narragansett Capital, Inc.,* 1989 WL 125190, at *10 (Del. Ch. Oct. 19, 1989) (citing *Stroud v. Milliken Enters., Inc.,* 552 A.2d 476, 480 (Del. 1989)).

[173] The Court of Chancery similarly found in dismissing Plaintiffs' claim for injunctive relief that the possibility of future harm was not reasonably conceivable.  Chancery Action*,* 285 A.3d at 1211 ("At present, it is not reasonably conceivable that the plaintiffs have a reasonable apprehension that the Challenged Restrictions will be reimposed.").  *Id.  See also Clark v. Governor of New Jersey,* 53 F.4th 769, 778 (3d Cir. 2022).  The Court of Appeals for the Third Circuit held that it was not reasonably likely that "the pandemic such as it presented itself in 2020 and 2021" would occur again.  *Id.*  The Court added:

> [I]t is hard to imagine that we could once again face anything quite like what confronted us then.  Moreover, the public health outlook has changed dramatically since the dark days of March 2020, when the ten-person gathering limit was implemented.  Our knowledge of the virus and its vectors of transmission, the rollout of vaccines, and the availability of therapeutic responses to infection have totally changed the nature of the disease itself, our understanding of it, and our response to it.  The accumulation of those changed circumstances thus make the return of the same pandemic and the same restrictions unlikely.

*Id.*

[174] *Albence v. Higgin,* 295 A.3d 1065, 1085-86 (Del. 2022).

45

exercise of the court's judicial powers."[175]  The plaintiff  "bears the burden of establishing the elements of standing."[176]  Unless there is specific statutory authority granting review, a plaintiff must establish the following elements of the standing requirement:

> (i) the plaintiff has suffered an 'injury-in-fact,' i.e., a concrete and actual invasion of a legally protected interest;
> (ii) there is a causal connection between the injury and the conduct complained of; and
> (iii) it is likely the injury will be redressed by a favorable court decision.[177]

The key question regarding the redressability prong of the standing analysis is whether "the effect of the court's judgment on the defendant . . . redresses the plaintiff's injury, [either] directly or indirectly."[178]  An injury is not remediable unless the relief requested is likely to remedy the violation.[179]  If it is only speculative that the requested relief will remedy the injury, this is insufficient to establish redressability.[180]  "'Relief that does not remedy the injury cannot bootstrap' a claim into court that the asserting party otherwise would have no standing to bring."[181]

---

[175] *Dover Hist. Soc. v. City of Dover Plan. Comm'n,* 838 A.2d 1103, 1110 (Del. 2003).

[176] *Id.* at 1109.

[177] *Albence,* 295 A.3d at 1086 (quoting *Reeder v. Wagner*, 974 A.2d 858 (TABLE), 2009 WL 1525945, at *2 (Del. 2009)); *O'neill v. Town of Middletown,* 2006 WL 205071, at *28 (Del. Ch. Jan. 18, 2006) (internal quotations omitted).

[178] *Case v. Ivey,* 542 F. Supp. 3d 1245, 1263 (M.D. Ala. 2021) (cleaned up) (internal citation omitted).

[179] *State v. MacColl,* 2022 WL 2388397, at *8 (Del. Super. July 1, 2022) (quoting *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 561 (1992) (cleaned up)).

[180] *Id.*

[181] *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998)).

While the standing analysis pursuant to Delaware law is substantially similar to the analysis of Article III standing in federal court, Delaware is not bound by the federal rules of justiciability.[182] Delaware's standing requirement is applied for the purpose of "'self-restraint to avoid the rendering of advisory opinions at the behest of parties who are 'mere intermeddlers.'"[183]

Plaintiffs request that this Court issue a judgment declaring that the Challenged Restrictions violated the First Amendment to the U.S. Constitution and Article I, Section 1 of the Delaware Constitution. Defendant argues that such relief cannot redress Plaintiffs' alleged injuries. The Court agrees. Plaintiffs do not have standing to bring their claims because they have not shown a likelihood that a declaratory judgment issued by this Court could provide meaningful relief redressing their alleged injuries.[184] Even if the Restrictions did violate these laws, Plaintiffs

---

[182] *Albence,* 295 A.3d at 1086.

[183] *Id.* (quoting *Dover Hist. Soc. v. City of Dover Plan. Comm'n,* 838 A.2d 1103, 1111 (Del. 2003)).

[184] Although the Court is adjudicating the standing issue pursuant to Rule 12(b)(1), the Court finds that Plaintiffs would lack standing regardless of whether it was evaluated under 12(b)(1) or 12(b)(6). Many federal courts have found that plaintiffs have lacked standing to bring a claim challenging COVID-19 restrictions that were terminated before the complaint was filed. *See, e.g.*, *Case,* 542 F. Supp. 3d at 1263-64 (holding an injunction prohibiting defendants from enforcing a provision that had already expired before plaintiffs filed their complaint would not redress plaintiffs injuries); *Smith v. Ivey*, 501 F. Supp. 3d 1248, 1262–63 (M.D. Ala. 2020) (finding court could not redress plaintiff's injuries allegedly caused by challenged action because it was not in effect when plaintiff filed suit); *Let Them Play MN v. Walz,* 556 F. Supp. 3d 968, 976-77 (D. Minn. 2021) (holding plaintiffs did not establish redressable injury necessary for declaratory relief because the three complained-of restrictions were no longer in effect); *Hotze v. Abbott,* 2021 WL 3611048, at *4 (S.D. Tex. July 23, 2021) (holding plaintiffs could not establish standing in part because complained-of orders were superseded by later orders and thus they could not demonstrate a continuing injury or threatened future injury necessary to merit declaratory relief).

have failed to show how such a declaratory judgment would alter the status quo when the Restrictions have already been lifted. Plaintiffs' right to freedom of speech, religion, and assembly will not be restored or further protected by such relief. The Court cannot permit this case to move forward solely on the possibility that it may bring Plaintiffs satisfaction to receive a declaration that the Governor's conduct was unlawful.[185] Because a declaratory judgment would not redress Plaintiffs' alleged injuries, Plaintiffs do not have standing to bring their claim for declaratory relief.

## C. The doctrine of mootness and its exceptions are inapplicable to Plaintiffs' claims.

Plaintiff argues that while their claim might be moot because the Challenged Restrictions have been lifted, that various exceptions to the mootness doctrine apply. The Court will not address the exceptions to the mootness doctrine that Plaintiffs raise because this doctrine does not apply in the first instance. Mootness is a justiciability doctrine that addresses cases that may have been justiciable when filed, but have lost their justiciability at some point during the litigation.[186] For this doctrine to apply, therefore, Plaintiffs would need to show their claims were justiciable when filed. Plaintiffs would need to show that they had standing when

---

[185] *Sprint Nextel Corp v. iPCS, Inc.,* 2008 WL 2737409, at *12 (Del. Ch. July 14, 2008) (cleaned up) (stating declaratory judgments will not be granted "merely to satisfy a party's desire for an advisory opinion or an adjudication of hypothetical questions.").

[186] *Gen. Motors Corp. v. New Castle Cnty.,* 701 A.2d 819, 823 (Del. 1997) (stating "[a] proceeding may become moot in one of two ways: if the legal issue in dispute is no longer amenable to a judicial resolution; or, if a party has been divested of standing.").

they filed the complaint.[187]  As explained above, this case was not justiciable when it was filed because Plaintiffs did not have standing when it was filed.  Because Plaintiffs do not have standing, the doctrine of mootness is inapplicable.[188]

## CONCLUSION

In conclusion, Defendant's motion to dismiss is GRANTED.

Plaintiffs' claims for nominal and compensatory damages for their claims under the U.S. and Delaware Constitutions are dismissed on the basis of the qualified immunity doctrine and the State Tort Claims Act, respectively.

Plaintiffs' claims for declaratory relief under the U.S. and Delaware Constitutions are dismissed because they have not established a current case or controversy, and have not established such relief can redress their alleged injuries.

IT IS SO ORDERED.

/s/ Meghan A. Adams

**Meghan A. Adams, Judge**

---

[187] *See Dover Hist. Soc.,* 838 A.2d 1103, 1110 (Del. 2003).
[188] *Case,* 542 F. Supp. 3d at 1264 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000)) ("[I]f a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum.").